CAMPBELL, Appellee,

v.

MASSUCCI et al., Appellants.

[Cite as *Campbell v. Massucci et al.*, 190 Ohio App.3d 718, 2010-Ohio-4084.]

Court of Appeals of Ohio,
Eleventh District, Ashtabula County.

No. 2009–A–0040.

Decided Aug. 27, 2010.

Diane V. Grendell, J., filed a dissenting opinion.

Friedman, Domiano & Smith Co., L.P.A., and David R. Grant, for appellee.

Gallagher, Sharp, Fulton & Norman, Joseph W. Pappalardo, Timothy J. Fitzgerald, and Colleen R. Del Balso, for appellants.

The Law Offices of Steven K. Kelley and Steven K. Kelley, for appellant the city of Geneva.

TIMOTHY P. CANNON, Judge.

{¶ 1} Appellants, Ronald M. Massucci and the city of Geneva, appeal the judgment entered by the Ashtabula County Court of Common Pleas. The trial court denied appellants' motion for summary judgment.

{¶ 2} This case concerns Ohio's statute on sovereign immunity for municipalities and their employees—specifically, whether a municipality and a member of the city's fire department have immunity when the employee causes an accident when responding to an emergency.

{¶ 3} This matter involves a motor vehicle/pedestrian accident in Geneva, Ohio. The accident occurred near the intersection of Route 20, which is called Main Street in the city of Geneva, and Lockwood Avenue. Lockwood Avenue forms a "T" intersection with Main Street. A traffic signal controls this intersection, with standard green, yellow, and red indicators. Main Street is an east-west access route, with three distinct lanes—an eastbound lane, a westbound lane, and a center lane for turning.

{¶ 4} Massucci is an assistant fire chief with the city of Geneva Fire Department. This is a parttime position. In addition, at the time of the accident, Massucci was employed by Great Lakes Auto.

{¶ 5} On the evening of November 13, 2005, a brush fire was reported to the Geneva Fire Department. A dispatcher sent out a call on the fire department's radio, informing all members of the fire department about the brush fire. Massucci was at his residence when he received the call about the brush fire.

{¶ 6} Massucci responded to the brush fire in his personal vehicle, a 2002 Lincoln Continental. This vehicle was owned by Great Lakes Auto. Massucci's vehicle was not equipped with overhead lights or a siren. While en route to the scene of the fire, Massucci was traveling west on Main Street. The speed limit is 35 m.p.h. in this portion of Main Street; however, Massucci stated that he was traveling in excess of 45 m.p.h. He stated that when he approached the intersection with Lockwood Avenue, he slowed down to 45 m.p.h. He stated that the light was yellow when he entered the intersection.

{¶ 7} After Massucci proceeded through the intersection, he noticed Campbell, a pedestrian, in front of his car. Massucci stated that Campbell was in the westbound lane, the same lane in which he was traveling, and that Campbell was not in a designated crosswalk at that time. Despite swerving, Massucci was unable to avoid Campbell, and Massucci's vehicle struck Campbell. Campbell suffered significant injuries as a result of the collision.

{¶ 8} That same evening, Scott Morrow and his stepdaughter, Larissa Conley, heard emergency sirens in the area. Out of curiosity, Morrow and Conley

decided to determine what the emergency was. Morrow and Conley lived on Lockwood Avenue. Morrow backed out of his driveway in his van and proceeded north on Lockwood Avenue toward Main Street. Conley, who was 14 years old on the date in question, was riding in the front passenger seat. Morrow stopped at the red light at the intersection of Main Street and Lockwood Avenue. Morrow was in the left-turn lane on Lockwood Avenue, waiting to turn west onto Main Street.

{¶ 9} While waiting at the light, Morrow noticed Massucci's vehicle traveling west. Morrow commented to Conley that the vehicle was traveling fast, so they both watched Massucci's vehicle. Their testimony indicated that Massucci's vehicle increased its speed prior to entering the intersection. Further, they both stated that Massucci's traffic light was either yellow or red when he entered the intersection. In addition, Conley stated that Campbell was in the center turn lane at the time of the accident.

{¶ 10} Officer Todd Emmett of the Geneva Police Department responded to the accident scene and conducted an investigation. Emmett did not issue a citation to Massucci for speeding, due to his conclusion that both Massucci and Campbell were at fault.

{¶ 11} Campbell filed a complaint against several defendants, including Massucci, the city of Geneva, and Great Lakes Auto. In its answer, the city of Geneva asserted that it is entitled to statutory immunity pursuant to R.C. Chapter 2744. Thereafter, Great Lakes Auto, Massucci, and the city of Geneva filed a combined answer. In this pleading, both Massucci and the city of Geneva assert that they are entitled to immunity pursuant to R.C. Chapter 2744.

{¶ 12} Appellants filed a motion for summary judgment. Campbell filed a brief in opposition to appellants' motion for summary judgment. Appellants then filed a response to Campbell's brief in opposition.

{¶ 13} Campbell filed the affidavit of Brian Curran. In his affidavit, Curran states that he took 14 photographs of the accident scene approximately one month after the incident. Those photographs are attached to his affidavit. Appellants filed the affidavit of Harry Lipian. Lipian is an expert in accident reconstruction, and his preliminary report was attached to his affidavit. In addition, the affidavits of Massucci, Conley, Morrow, Fire Chief Douglas Starkey, and Emmett were submitted for the trial court's consideration.

{¶ 14} The trial court denied appellants' motion for summary judgment.

{¶ 15} Great Lakes Auto also filed a motion for summary judgment. However, Campbell filed a notice of voluntary dismissal, without prejudice, pursuant to Civ.R. 41, thereby dismissing the claims against Great Lakes Auto.

{¶ 16} Generally, the denial of a motion for summary judgment is not a final, appealable order. See *Malenda v. Celina Group,* 11th Dist. No. 2004–L–080, 2004-Ohio-5633, 2004 WL 2377167, at ¶ 2, citing *Overmeyer v. Walinski* (1966), 8 Ohio St.2d 23, 37 O.O.2d 358, 222 N.E.2d 312. However, the legislature has enacted R.C. 2744.02(C), which provides:

{¶ 17} "An order that denies a political subdivision or an employee of a political subdivision the benefit of an alleged immunity from liability as provided in this chapter or any other provision of the law is a final order."

{¶ 18} The Supreme Court of Ohio has addressed this issue, holding, "[W]hen a trial court denies a motion in which a political subdivision or its employee seeks immunity under R.C. Chapter 2744, that order denies the benefit of an alleged immunity and is therefore a final, appealable order pursuant to R.C. 2744.02(C)." *Hubbell v. Xenia,* 115 Ohio St.3d 77, 2007-Ohio-4839, 873 N.E.2d 878, syllabus. Thus, the trial court's judgment entry in this matter was a final, appealable order.

{¶ 19} Appellants raise two assignments of error. Their first assignment of error is as follows:

{¶ 20} "The trial court erred to the prejudice of defendants-appellants in denying their motion for summary judgment based on the sovereign immunity doctrine pursuant to the Ohio Political Subdivision Tort Liability Act, Ohio Rev.Code §§ 2744.01 et seq."

{¶ 21} In order for a motion for summary judgment to be granted, the moving party must demonstrate the following:

{¶ 22} "(1) [N]o genuine issue as to any material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made." *Mootispaw v. Eckstein* (1996), 76 Ohio St.3d 383, 385, 667 N.E.2d 1197.

{¶ 23} Summary judgment will be granted if "the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, * * * show that there is no genuine issue as to any material fact * * *." Civ.R. 56(C). Material facts are those that might affect the outcome of the suit under the governing law of the case. *Turner v. Turner* (1993), 67 Ohio St.3d 337, 340, 617 N.E.2d 1123, quoting *Anderson v. Liberty Lobby, Inc.* (1986), 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202.

{¶ 24} If the moving party meets this burden, the nonmoving party must then provide evidence illustrating a genuine issue of material fact, pursuant to Civ.R.

56(E). *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264. Civ.R. 56(E) provides:

{¶ 25} "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the party's pleadings, but the party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the party does not so respond, summary judgment, if appropriate, shall be entered against the party."

{¶ 26} Summary judgment is appropriate pursuant to Civ.R. 56(E), if the nonmoving party does not meet this burden.

{¶ 27} Appellate courts review a trial court's entry of summary judgment de novo. *Brown v. Scioto Cty. Bd. of Commrs.* (1993), 87 Ohio App.3d 704, 711, 622 N.E.2d 1153. "*De novo* review means that this court uses the same standard that the trial court should have used, and we examine the evidence to determine whether as a matter of law no genuine issues exist for trial." *Brewer v. Cleveland Bd. of Edn.* (1997), 122 Ohio App.3d 378, 383, 701 N.E.2d 1023, citing *Dupler v. Mansfield Journal* (1980), 64 Ohio St.2d 116, 119–120, 18 O.O.3d 354, 413 N.E.2d 1187.

{¶ 28} The Supreme Court of Ohio has held:

{¶ 29} "Determining whether a political subdivision is immune from tort liability pursuant to R.C. Chapter 2744 involves a three-tiered analysis. *Greene Cty. Agricultural Soc. v. Liming* (2000), 89 Ohio St.3d 551, 556–557, 733 N.E.2d 1141. The first tier is the general rule that a political subdivision is immune from liability incurred in performing either a governmental function or proprietary function. Id. at 556–557, 733 N.E.2d 1141; R.C. 2744.02(A)(1). However, that immunity is not absolute. R.C. 2744.02(B); *Cater v. Cleveland* (1998), 83 Ohio St.3d 24, 28, 697 N.E.2d 610.

{¶ 30} "The second tier of the analysis requires a court to determine whether any of the five exceptions to immunity listed in R.C. 2744.02(B) apply to expose the political subdivision to liability. Id. at 28, 697 N.E.2d 610. At this tier, the court may also need to determine whether the specific defenses to liability for negligent operation of a motor vehicle listed in R.C. 2744.02(B)(1)(a) through (c) apply.

{¶ 31} "If any of the exceptions to immunity in R.C. 2744.02(B) do apply and no defense in that section protects the political subdivision from liability, then the third tier of the analysis requires a court to determine whether any of the defenses in R.C. 2744.03 apply, thereby providing the political subdivision a defense against liability." *Colbert v. Cleveland,* 99 Ohio St.3d 215, 2003-Ohio-3319, 790 N.E.2d 781, at ¶ 7–9.

{¶ 32} Appellants claim that they are entitled to immunity pursuant to R.C. 2744.02, which provides as follows:

{¶ 33} "(B) Subject to sections 2744.03 and 2744.05 of the Revised Code, a political subdivision is liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by an act or omission of the political subdivision or of any of its employees in connection with a governmental or proprietary function, as follows:

{¶ 34} "(1) Except as otherwise provided in this division, political subdivisions are liable for injury, death, or loss to person or property caused by the negligent operation of any motor vehicle by their employees when the employees are engaged within the scope of their employment and authority. The following are full defenses to that liability:

{¶ 35} " * * *

{¶ 36} "(b) A member of a municipal corporation fire department or any other firefighting agency was operating a motor vehicle while engaged in duty at a fire, proceeding toward a place where a fire is in progress or is believed to be in progress, or answering any other emergency alarm and the operation of the vehicle did not constitute willful or wanton misconduct."

{¶ 37} Thus, since Campbell's injuries were caused by a municipal employee, who is a member of a municipal fire department and who was proceeding toward a place where a fire was in progress,[1] the question to be answered is whether the record establishes an issue of fact concerning whether Massucci's actions constitute willful or wanton misconduct.

{¶ 38} Regarding the term "wanton misconduct," the Supreme Court of Ohio has held:

{¶ 39} "We agree with appellants that the issue of wanton misconduct is normally a jury question. *Matkovich v. Penn. Cent. Transp. Co.* (1982), 69 Ohio St.2d 210, 23 O.O.3d 224, 431 N.E.2d 652. The standard for showing wanton misconduct is, however, high. In *Hawkins v. Ivy* (1977), 50 Ohio St.2d 114, 4 O.O.3d 243, 363 N.E.2d 367, syllabus, we held that wanton misconduct was the failure to exercise any care whatsoever. In *Roszman v. Sammett* (1971), 26 Ohio St.2d 94, 96–97, 55 O.O.2d 165, * * *, 269 N.E.2d 420, we stated, '[M]ere negligence is not converted into wanton misconduct unless the evidence establishes a disposition to perversity on the part of the tortfeasor.' Such perversity

---

1. In his brief, Campbell contends that Massucci did not have any equipment with him, he knew other vehicles were responding to the fire, and no lives were endangered by the fire. R.C. 2744.02(B)(1)(b) requires only that Massucci was "proceeding toward a place where a fire is in progress or is believed to be in progress." Thus, for purposes of this appeal, the severity of the fire and Massucci's intentions upon arriving at the scene are not relevant.

must be under such conditions that the actor must be conscious that his conduct will in all probability result in injury. Id. at 97 * * *." *Fabrey v. McDonald Police Dept.* (1994), 70 Ohio St.3d 351, 356, 639 N.E.2d 31.

{¶ 40} In addition, this court has adopted the following definition of "willful misconduct":

{¶ 41} "As to 'willful misconduct,' it 'implies an intentional deviation from a clear duty or from a definite rule of conduct, a deliberate purpose not to discharge some duty necessary to safety, or purposely doing wrongful acts with knowledge or appreciation of the likelihood of resulting injury.' " *Thompson v. Smith*, 178 Ohio App.3d 656, 2008-Ohio-5532, 899 N.E.2d 1040, at ¶ 41, quoting *Tighe v. Diamond* (1948), 149 Ohio St. 520, 526, 37 O.O. 243, 80 N.E.2d 122.

{¶ 42} In this matter, Massucci's car was not equipped with overhead lights or a siren. A copy of the policy manual of the Geneva Fire Department was attached to Massucci's deposition as an exhibit. In the section of the policy pertaining to the operation of motor vehicles, provision 2.4 provides, "If a member's car is not equipped as an emergency vehicle, he/she shall obey all local and state laws." In his deposition, Chief Starkey confirmed that this was the current policy of the Geneva Fire Department. In his deposition, Massucci acknowledged this policy. Specifically, he stated that under the policy, vehicles without lights and sirens must stop for red traffic lights and must maintain the posted speed limit.

{¶ 43} The Geneva Fire Department has different policies concerning vehicles responding with overhead lights and sirens. The policy states, "When responding to an emergency, both Red Light and Siren must be in operation * * * at all times." The policy apparently provides for some discretion to the responding firefighter to exceed the posted speed limit, as it merely states that responding units shall proceed at a "safe speed." Regarding compliance with traffic signals for vehicles with lights and siren activated, the policy provides:

{¶ 44} "When approaching an intersection with controlled traffic signals with the green light, the responding units shall slow down and proceed with caution when all adjacent have been visually inspected and are clear.

{¶ 45} "When approaching an intersection with controlled traffic signals with the red light, the responding units shall come to a complete stop and inspect all adjacent streets. Once they are clear or all on coming traffic has stopped, you may proceed with caution."

{¶ 46} Thus, even for vehicles responding with overhead lights and siren activated, the policy manual requires the vehicle to stop at red lights and determine that it is safe to proceed through the intersection. Moreover, even if

the light is green, those vehicles are required to "slow down and proceed with caution."

{¶ 47} In this matter, these distinctions for vehicles responding with and without lights and a siren are significant. The policy itself provides some discretion to firefighters responding with lights and siren activated, in that they need not strictly comply with all traffic laws, provided they operate their vehicle in a safe manner. However, since Massucci was operating his vehicle without lights and a siren, he was required to obey all local and state laws. It is with this standard of care in mind that we will analyze this case.

{¶ 48} In this matter, there are several issues of material fact regarding whether Massucci's conduct rose to the level of willful or wanton misconduct that need to be resolved by a trier of fact.

{¶ 49} One of the remaining issues of fact is the speed Massucci was traveling in the posted 35 m.p.h. zone on Main Street. In his deposition, Massucci stated: "I was going a little faster than the speed was posted. I slowed down to the intersection because there were two cars. I looked down at my speedometer, that's why I'm fairly adamant about my speed, and I was doing 45 m.p.h." Massucci indicated that he was going faster than 45 m.p.h. prior to slowing down for the intersection.

{¶ 50} Conley could not estimate a specific speed that Massucci's vehicle was traveling. Instead, she simply stated that his vehicle "was going fast" and was traveling "faster than usual" referring to the speed of most of the cars that travel on Main Street.

{¶ 51} In his statement to police, Morrow stated that Massucci's vehicle was speeding to beat the traffic light. Morrow estimated that Massucci's vehicle was traveling between 45 and 50 m.p.h.

{¶ 52} Appellants submitted the affidavit of Henry Lipian, who they retained as an expert in accident reconstruction. In his report, Lipian concluded that the range of speed Massucci was traveling at the time of impact was 47 to 51 m.p.h.

{¶ 53} Another issue of material fact in this matter is the color of the traffic signal when Massucci entered the intersection. Massucci stated that "just as he got" to the traffic signal, it turned yellow. Later in his deposition, Massucci stated that he was "25 to 50 feet maximum" from the intersection when he noticed the light turn yellow.

{¶ 54} In her statement to police, Conley stated that Massucci's light was yellow. However, she later interlined the word yellow, wrote red above it, and initialed the change. In her deposition, Conley stated that Massucci's vehicle was in the intersection when the light for traffic on Lockwood Avenue was green. At

another point, Conley stated that the light facing Lockwood Avenue turned green when Massucci's car was "a little past the white line where you have to stop." Finally, Conley stated that she did not know where in the intersection Massucci's car was when the light facing Lockwood Avenue turned green.

{¶ 55} In his police statement, Morrow stated that Massucci's light was "yellow about to turn red or already red." In his deposition, Morrow stated that Massucci's car was more than 100 feet from the intersection when the light facing Main Street turned yellow. At one point in his deposition, Morrow stated that Massucci's light was "red before he got to the intersection." However, he later stated that he did not know whether the light was yellow or red when Massucci entered the intersection.

{¶ 56} A third issue of material fact is whether Massucci "crashed" the light because he was trying to get through the intersection prior to yielding to another responding vehicle, which was equipped with emergency lights and a siren. When Massucci was travelling on Main Street, he noticed another vehicle, with lights and siren activated, following behind him. He explained that "as I got to the intersection or going through the intersection I did look in my rearview mirror to see if the fireman behind me was close enough for me to pull over and give way to him." Thus, there is a question of fact as to whether Massucci should have pulled over and yielded to the other vehicle prior to entering the intersection.

{¶ 57} An additional issue of material fact is whether Massucci slowed down prior to entering the intersection. Massucci states that he slowed down to 45 m.p.h. prior to entering the intersection. Conley states that she heard Massucci's car "speed up, like he was hitting the gas or something," just prior to it entering the intersection. However, later in her deposition, she stated that the car "was getting louder. But it could have been because he was coming closer."

{¶ 58} Morrow stated that Massucci sped up to beat the light change. In the following colloquy, Morrow explained how he knew the vehicle sped up:

{¶ 59} "Q. When you noticed that its light had turned yellow, at that point in time, did something change that you were able to estimate its speed?

{¶ 60} "A. I could see that it sped up. You know, you could see the headlights moving. That's the only way I could tell if it was slowing down or speeding up was the height of its headlights. You could tell that they went up in the air, that the car was taking off to go faster.

{¶ 61} "Q. Okay. Let's be clear on that. Did you notice the headlights on that car lift up in the air?

{¶ 62} "A. Yes.

{¶ 63} "Q. At what point in time, either distance or color of the light, did you notice that happen?

{¶ 64} "A. Right after I noticed that it turned yellow. I looked back towards the car and you could tell it was speeding up because the headlights lifted up and it started heading—that's why I wasn't pulling out in front of it because I knew it was—wasn't going to stop for the light."

{¶ 65} A final issue of material fact is what lane Massucci was traveling in when he struck Campbell. Massucci stated that Campbell was "in the middle" of the westbound lane of travel at the time of impact. He stated that he swerved to his right to avoid Campbell and that the right side of his car was off the street and in the tree lawn when he hit Campbell. Conley stated that she witnessed the accident. According to Conley, Campbell was inside the center turn lane when Massucci's car struck him. Later in her deposition, she stated that he was inside the turn lane, but closer to the westbound lane.

{¶ 66} In their brief, appellants assert that Campbell "appeared in Assistant Chief Massucci's lane of travel without warning." However, this assertion is disputed by Conley's statement that she saw Campbell walking across the street prior to the impact, as well as by Lipian's report, which concluded that Campbell was walking on Main Street for 5.3 seconds prior to the accident.

{¶ 67} Also, appellants argue that the "risk of harm" of Massucci's lack of overhead lights and a siren was negated because other vehicles in the area were operating with lights and sirens. The policy of the Geneva Fire Department is clear that vehicles without lights and sirens was to obey all state laws. To the extent that appellants are arguing that a vehicle without lights and a siren are permitted to "draft" a vehicle equipped with lights and a siren and then disregard state traffic laws, their argument is unpersuasive.

{¶ 68} When the evidence is construed most strongly in Campbell's favor, it indicates that Massucci was traveling as fast as 51 m.p.h. in a 35 m.p.h. zone; that Massucci sped up as he approached the intersection; that Massucci did not immediately pull to the side of the street to yield to the emergency vehicle behind him, but instead attempted to get through the intersection prior to yielding; that Massucci entered the intersection against a red light; and that Massucci was traveling, at least partially, in the center turn lane when his vehicle struck Campbell. Taken together, these facts could support a finding that Massucci's conduct was willful and/or wanton on the night in question.

{¶ 69} Our opinion should not be construed as holding that any violation of a traffic law (and in this case the Geneva Fire Department policy manual) constitutes willful and wanton conduct per se. In a situation where a municipal employee responding to a fire or other qualified emergency commits a minor

traffic violation, the conduct of the employee may amount to negligence, yet statutory immunity would still apply because his or her conduct does not rise to the level of willful or wanton. However, in this matter, there is evidence in the record suggesting that Massucci may have intentionally violated several traffic laws on the night in question. Appellants ask this court to reverse the judgment of the trial court. If we were to so hold, the law of this appellate district would permit a municipal employee responding to a fire to travel 50 m.p.h., through a red light, in the wrong lane, in a private vehicle, with no lights or siren, and still avoid liability for himself and the municipality based on immunity. We decline to do so.

{¶ 70} In support of their position, appellants point to a case recently decided by the First Appellate District, *Whitley v. Progressive Ins. Co.*, 1st Dist. Nos. C–090240 and C–090284, 2010-Ohio-356, 2010 WL 396021. However, that case is distinguishable from the within matter. In that case, there was no allegation that the officer was speeding. In fact, it is clear that he was driving below the posted speed limit. Id. at ¶ 21. In addition, in accord with the burden-shifting obligations discussed above in a summary-judgment exercise, it is clear that the plaintiffs in *Whitley* presented little or no expert evidentiary material or department policy manuals. In this case, in addition to the excessive speed, there was expert testimony and evidence of clear violations of the department policy manual to consider. Finally, the officer in *Whitley* was driving a marked police cruiser, and the court analyzed his conduct under R.C. 4511.03, which permits emergency and public safety vehicles to "proceed cautiously" through a red light if the driver is responding to an emergency call. Id. at ¶ 14. In this matter, as noted above, Massucci was driving a private, unmarked vehicle, which was not equipped with overhead lights or a siren. Thus, he had no status as an emergency or public-safety vehicle and was not permitted to enter an intersection against a red light or violate any other traffic law.

{¶ 71} In a similar case, this court has recently addressed municipal immunity. *Thompson v. Smith*, 178 Ohio App.3d 656, 2008-Ohio-5532, 899 N.E.2d 1040. In *Thompson v. Smith*, a police officer was responding to an emergency call. The officer did not activate his siren or flashing overhead lights while en route to the emergency destination. He traveled through an intersection, with a green traffic light, and executed a right-hand turn. After making the turn, the vehicle struck a pedestrian, killing her. Although the speed limit was 35 m.p.h., the officer stated that he was traveling no faster than 45 m.p.h., and an investigation by the Ohio State Highway Patrol "estimated his speed to be at least 38 m.p.h. and probably within the range of 59 m.p.h. to 66 m.p.h." Id. at ¶ 5. This court concluded:

{¶ 72} "The trial court properly deferred to the jury for a determination of whether Officer Smith, by exceeding the speed limit and not utilizing his emergency equipment, failed to exercise any care owed to Ms. Thompson under circumstances where there was a great probability that harm would result from his lack of care, and whether he intentionally deviated from a clear duty with a deliberate purpose not to discharge some duty necessary to safety." Id. at ¶ 46.

{¶ 73} We believe, as did the trial court, that the case sub judice is similar to *Thompson v. Smith*, in that a trier of fact needs to resolve the genuine issues of material fact as to whether Massucci's conduct was willful and/or wanton.

{¶ 74} Appellants additionally argue that they are entitled to immunity pursuant to R.C. 2744.03(A)(2), which provides:

{¶ 75} "(A) In a civil action brought against a political subdivision or an employee of a political subdivision to recover damages for injury, death, or loss to person or property allegedly caused by any act or omission in connection with a governmental or proprietary function, the following defenses or immunities may be asserted to establish nonliability:

{¶ 76} " * * *

{¶ 77} "(2) The political subdivision is immune from liability if the conduct of the employee involved, other than negligent conduct, that gave rise to the claim of liability was required by law or authorized by law, or if the conduct of the employee involved that gave rise to the claim of liability was necessary or essential to the exercise of powers of the political subdivision or employee."

{¶ 78} For this analysis, it is crucial to determine the conduct that "gave rise to the claim of liability." Appellants assert that the conduct was the more general act of responding to the fire. However, the specific act was Massucci's driving and the alleged violations of traffic laws that caused the accident. Appellants' argument is unpersuasive.

{¶ 79} Appellants' first assignment of error is without merit.

{¶ 80} Appellants' second assignment of error is:

{¶ 81} "The trial court erred to the prejudice of Defendant–Appellant Ronald Massucci in overruling his motion for summary judgment pursuant to the Ohio Political Subdivision Tort Liability Act, Ohio Rev.Code § 2744.01 et seq."

{¶ 82} Appellants argue that Massucci is entitled to immunity pursuant to R.C. 2744.03(A)(6), which provides:

{¶ 83} "(A) In a civil action brought against a political subdivision or an employee of a political subdivision to recover damages for injury, death, or loss to person or property allegedly caused by any act or omission in connection with a

governmental or proprietary function, the following defenses or immunities may be asserted to establish nonliability:

{¶ 84} " * * *

{¶ 85} "(6) In addition to any immunity or defense referred to in division (A)(7) of this section and in circumstances not covered by that division or sections 3314.07 and 3746.24 of the Revised Code, the employee is immune from liability unless one of the following applies:

{¶ 86} "(a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;

{¶ 87} "(b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;

{¶ 88} "(c) Civil liability is expressly imposed upon the employee by a section of the Revised Code. * * * "

{¶ 89} For the reasons stated in our analysis of appellants' first assignment of error, there is a genuine issue of material fact as to whether Massucci acted wantonly.

{¶ 90} As to whether Massucci acted recklessly, an actor's conduct is " 'in reckless disregard of the safety of others if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.' " *Thompson v. McNeill,* 53 Ohio St.3d 102, 104–105, 559 N.E.2d 705, quoting 2 Restatement of the Law 2d, Torts (1965) 587, Section 500.

{¶ 91} Whether conduct amounts to recklessness, like the inquiry into whether conduct constitutes wantonness, is generally left to the jury. Id. at ¶ 67.

{¶ 92} In this matter, the evidence in the record suggests that Massucci entered the intersection against a red light, while speeding and traveling outside his lane of travel, without any emergency lights or a siren. When taken together and viewed in a light most favorable to Campbell, the above-stated evidence is sufficient to create a genuine issue of material fact as to whether Massucci's conduct rose to the level of recklessness.

{¶ 93} Appellants' second assignment of error is without merit.

{¶ 94} The judgment of the Ashtabula County Court of Common Pleas is affirmed.

Judgment affirmed.

TRAPP, P.J., concurs.

GRENDELL, J., dissents.

DIANE V. GRENDELL, Judge, dissenting.

{¶ 95} I respectfully disagree with the majority's conclusion that the question whether Assistant Chief Massucci's operation of his vehicle constituted willful or wanton misconduct should be adjudicated at trial. Accordingly, I dissent.

{¶ 96} "The Supreme Court has also held that 'wanton misconduct [is] the failure to exercise any care whatsoever.' *Fabrey v. McDonald Village Police Dept.* [1994], 70 Ohio St.3d 351, 356[, 639 N.E.2d 31]. The court has explained, ' "[M]ere negligence is not converted into wanton misconduct unless the evidence establishes a disposition to perversity on the part of the tortfeasor." Such perversity must be under such conditions that the actor must be conscious that his conduct will in all probability result in injury.' Id.[, quoting *Roszman v. Sammett* (1971), 26 Ohio St.2d 94, 96–97, 55 O.O.2d 165, 269 N.E.2d 420]." *Cornelison v. Colosimo*, 11th Dist. No. 2009–T–0099, 2010-Ohio-2527, 2010 WL 2245614, at ¶ 42.

{¶ 97} Willful misconduct "implies intent, but the intention relates to the misconduct and not merely to the fact that some specific act, such as operating an automobile, was intentionally done." *Tighe v. Diamond* (1948), 149 Ohio St. 520, 527, 37 O.O. 243, 80 N.E.2d 122.

{¶ 98} "Although wanton misconduct normally is a jury question, the standard of showing wanton misconduct is high. Where the evidence in the record does not suggest a material fact issue on the question of reckless or willful or wanton misconduct, a trial court may properly determine the case by means of summary judgment." *Iberis v. Mahoning Valley Sanitary Dist.* (Dec. 21, 2001), 11th Dist. No. 2000–T–0036, 2001 WL 1647184, at *6.

{¶ 99} The record in this case demonstrates that Massucci was negligent, but the evidence does not establish that Massucci engaged in willful or wanton misconduct. This court has previously held that when "[c]onsidering the totality of the evidentiary materials," if "there is no evidence that [the] [o]fficer * * * acted in deliberate or reckless disregard for the safety of others," then "as a matter of law, there is no material issue of fact regarding whether [the] [o]fficer['s] * * * conduct constituted 'willful or wanton misconduct,' " and summary judgment should be granted. *Rodgers v. DeRue* (1991), 75 Ohio App.3d 200, 205, 598 N.E.2d 1312.

{¶ 100} Massucci's behavior, while negligent, did not connote a deliberate or reckless disregard for the safety of others; he utilized a degree of care in response to the emergency call. He testified that he drove 45 m.p.h. in a 35

m.p.h. zone, slowed down when he approached the intersection, and swerved in an attempt to avoid the accident.

{¶ 101} While, as the majority notes, there may be differing views about Massucci's speed, "[t]he parties' dispute as to * * * his actual speed does not * * * preclude a grant of summary judgment." *Ybarra v. Vidra,* 6th Dist. No. WD–04–061, 2005-Ohio-2497, 2005 WL 1201224, at ¶ 18. Furthermore, Massucci's speed did not demonstrate misconduct sufficient to overcome sovereign immunity; driving in excess of the posted speed limit is not akin to willful or wanton misconduct.

{¶ 102} Additionally, the lack of emergency lights and sirens on his vehicle does not constitute willful or wanton misconduct. *Lipscomb v. Lewis* (1993), 85 Ohio App.3d 97, 100–101, 619 N.E.2d 102 (a driver of an emergency vehicle does not automatically lose immunity under R.C. Chapter 2744 by failing to activate the vehicle's lights or siren on an emergency run). Furthermore, Massucci was not required to equip his personal vehicle with emergency lights and sirens. Moreover, emergency vehicles with activated emergency lights and audible sirens had passed through the intersection before Massucci and were traveling shortly behind Massucci, alerting pedestrians and drivers near the intersection of the approaching emergency vehicles.

{¶ 103} Evidence presented showed that Massucci swerved to the right in an effort to avoid hitting Campbell. Further, Massucci slowed his vehicle, demonstrating an exercise of caution, as he approached the intersection. See *Moore v. Columbus* (1994), 98 Ohio App.3d 701, 708, 649 N.E.2d 850 ("Officer Elder immediately applied his brakes and swerved in an attempt to miss the vehicle. This behavior simply does not constitute a deliberate or reckless disregard for the safety of others"). The fact that Massucci acted to avoid and/or minimize the impact of the collision, even though he was unsuccessful, shows that he did not fail to exercise any care whatsoever or act in a reckless disregard of the safety of others. See *Hewitt v. Columbus,* 10th Dist. No. 08AP–1087, 2009-Ohio-4486, 2009 WL 2759735, at ¶ 29.

{¶ 104} While the evidence demonstrates that Massucci operated his vehicle in a negligent manner, the evidence presented does not demonstrate that Massucci was indifferent to the safety of others and/or deliberately failed to discharge some specific duty relating to safety. See *Tighe,* 149 Ohio St. at 527, 80 N.E.2d 122. To avoid summary judgment, evidence of a "disposition to perversity" or "reckless or willfulness" is required. See *Cornelison,* 2010-Ohio-2527, 2010 WL 2245614, at ¶ 42. A jury cannot be allowed to infer willful and wanton misconduct from a series of negligent acts. Accordingly, the majority's conversion of negligent conduct into willful/wanton misconduct establishes a troublesome precedent.

{¶ 105} Regarding the city of Geneva's liability, a city is liable for injury, death, or loss of property caused by the negligent operation of a motor vehicle by its employee when the employee is engaged in the scope of his or her employment and authority. R.C. 2744.02(B). However, a statutory defense to liability applies in this case. A city is immune from liability when "[a] member of a municipal corporation fire department or any other firefighting agency was operating a motor vehicle while engaged in duty at a fire, proceeding toward a place where a fire is in progress or is believed to be in progress, or answering any other emergency alarm and the operation of the vehicle did not constitute willful or wanton misconduct." R.C. 2744.02(B)(1)(b). Because Massucci was responding to a fire in progress and his acts, while negligent, did not constitute willful or wanton misconduct, the city of Geneva is immune from liability.

{¶ 106} While Massucci should not have operated his vehicle in a negligent manner and the harm caused by his negligence is devastating, both Massucci and the city of Geneva are entitled to immunity under R.C. Chapter 2744. Accordingly, I would reverse the decision of the trial court and grant summary judgment.

{¶ 107} For the reasons stated above, I respectfully dissent.