RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 18a0232p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

SHERRY WILKERSON, Administrator of the Estate of Raupheal Thomas,

       *Plaintiff-Appellee/Cross-Appellant*,

    *v.*

CITY OF AKRON, OHIO; JOSEPH DANZY,

       *Defendants-Appellants/Cross-Appellees*,

EDWARD STEWART; JAMES NICE, in his official capacity,

       *Defendants-Appellees*.

Nos. 17-4108/4157

---

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 5:15-cv-02266—John R. Adams, District Judge.

Argued: October 4, 2018

Decided and Filed: October 15, 2018

Before: SUTTON, McKEAGUE, and THAPAR, Circuit Judges.

---

## COUNSEL

**ARGUED:** John Christopher Reece, CITY OF AKRON, Akron, Ohio, for Appellants/Cross-Appellees City of Akron and Joseph Danzy and for Appellees Edward Stewart and James Nice. Jeremy A. Tor, SPANGENBERG SHIBLEY & LIBER LLP, Cleveland, Ohio, for Appellee/Cross-Appellant. **ON BRIEF:** John Christopher Reece, Michael J. Defibaugh, CITY OF AKRON, Akron, Ohio, for Appellants/Cross-Appellees City of Akron and Joseph Danzy and for Appellees Edward Stewart and James Nice. Jeremy A. Tor, Nicholas A. DiCello, SPANGENBERG SHIBLEY & LIBER LLP, Cleveland, Ohio, for Appellee/Cross-Appellant.

---

**OPINION**

---

SUTTON, Circuit Judge.   Police Officer Joseph Danzy responded to a call about two suspicious men in an Akron neighborhood.  He found Rauphael Thomas and Jesse Gray standing on the sidewalk.  One thing (a *Terry* frisk) led to another (a tussle on the ground), which led to still another (the discharge of Thomas's concealed pistol).  That, tragically, was not the end of the encounter.  Thomas sprinted away, and Danzy shot him.  Thomas died.  His mother and estate administrator, Sherry Wilkerson, filed constitutional and state-tort claims against the officers, the City of Akron, and its police department.  The district court denied Danzy summary judgment on one claim, which Danzy appeals.  And it granted the defendants summary judgment on the other claims, which Wilkerson cross-appeals.  We affirm.

I.

Off-duty Akron Police Officer Howard Vaughn saw a parked SUV with what looked like a flat tire in his neighborhood.  He saw Thomas in the driver's seat and Gray in the front passenger's seat.  After returning from a ten-minute errand, Vaughn noticed that the SUV was gone.  Vaughn came upon the two men standing in his driveway with no SUV in sight.  They did not move immediately, but eventually allowed Vaughn to pull in and park.  When Vaughn asked if he could help them, one replied, "Ah nah, we good."  R. 22-1 at 2.

Thinking "something was not right," Vaughn looked out his window a moment later and saw Thomas and Gray standing in his neighbor's driveway.  *Id.*  Because the SUV was gone and the men seemed to be loitering, he suspected they were casing houses to burglarize, a fear escalated by recent break-ins in the neighborhood.  Vaughn called Officer Danzy, then patrolling the area, and radioed Akron police dispatch when Danzy did not answer.  He requested a unit to check on two suspicious persons, explaining that he had seen their SUV with a blown tire a few minutes before, adding "I don't know if they're casing the neighborhood or not."  R. 22-2 at 33.

Danzy heard Vaughn's message over his radio and headed to the scene. "[F]earful that maybe [Vaughn] had to take some type of police action," Danzy activated the cruiser's emergency lights when the dispatcher called Vaughn back and he didn't respond. *Id.*

Danzy pulled up beside Thomas and Gray, who were standing in the deepening dusk on the grassy strip between the street and the sidewalk, still near Vaughn's house. Danzy's dash-camera video shows Thomas and Gray stepping up to the cruiser's hood and pointing ahead. As Danzy leaves his cruiser, the men say "something about having a flat tire" and point in the general direction of a gas station. *Id.* at 33–34. The video shows Thomas, after pointing, glancing away before looking back at Danzy. Thomas turns away and takes two slow steps away from the police car before he stops at Danzy's command.

During this ten-second exchange, Danzy thought Thomas "appeared very nervous, and he was looking around . . . somewhat agitated [and] repeating himself." *Id.* at 38. From Danzy's perspective, "immediately after looking around," Thomas pivoted away with a motion Danzy interpreted as "blading," which apparently means swiveling one's torso away from a potential assailant in a way meant to conceal a sidearm. *Id.* at 36, 38. Danzy testified that this motion, combined with Thomas's demeanor, Vaughn's call to dispatch, and the fact that Danzy was alone, prompted him to stop Thomas and pat him down.

Officer Edward Stewart, also responding to Vaughn's call, approached on foot as Danzy ordered Thomas back to the cruiser and told Thomas to take his hands out of his pockets. Thomas raised his arms but, as Danzy described it, "tried to bring his right hand down . . . a couple of times," "reach[ing] down again after [Danzy] was talking to him, and he stiffened up and wouldn't relax." *Id.* at 37. Stewart observed a similar dynamic, testifying that the 6'3" Thomas "was hesitant" to raise both arms and Danzy, a smaller man, was "having a hard time" keeping Thomas's arms stationary as he maneuvered Thomas against the cruiser's hood. R. 22-3 at 18, 20. Stewart grabbed Thomas's left forearm and held it against the hood while Danzy tried to bring Thomas's right arm behind his head. The officers could not get control of Thomas's arms and he finally twisted away from them, darting off-camera. Danzy tried his taser. When that didn't work, Stewart ran after Thomas and tackled him on the grass between the sidewalk and the street.

For about 40 seconds, the men struggled off-camera.  Stewart testified that he attempted to radio for help but couldn't reach his radio while wrestling with Thomas.  Danzy described the struggle as "very dynamic," "a fight."  R. 22-2 at 40.  Somehow, Thomas's Astra .25-caliber pistol discharged.  Stewart testified that the shot was muffled, seeming to come from underneath Thomas, and that he didn't see the weapon.  Danzy testified that Thomas pointed the gun at him with both hands and it went off in the air as the two struggled for it.  A .25-caliber casing, which ballistics confirmed came from the Astra, was recovered in the grassy area where the men had wrestled.  Thomas's DNA was all over the small weapon (just three-and-a-half-inches long), including the trigger, and he had gunshot residue on his hands.  Danzy's DNA was on the gun's barrel and slide.

After the shot, Thomas pushed off Stewart and ran, reentering the dash camera's view.  Off-camera, Stewart jumped up and ran for him, but froze when Danzy, getting to his feet in Stewart's periphery, yelled, "'Stew, stop,' or 'Don't, he's got a gun,' words like that."  R. 22-3 at 22, 25.  Chasing Thomas, Danzy fired two shots in quick succession.  Danzy testified that he fired without pausing to take cover because he feared for his life and Stewart's, and considered himself "in the middle of an active, dynamic threat."  R. 22-2 at 42–43.

Thomas fell on Danzy's second shot.  Police found the Astra next to Thomas.  Danzy cuffed Thomas because he "had just fired a shot at [Danzy]" and "could have drawn another gun and fired it."  *Id.* at 43–44.  Danzy radioed for an ambulance.  Thomas was conscious, screaming in pain, and bleeding, though not profusely.  Noticing that Thomas's breathing was labored, Stewart radioed again to tell the ambulance to "step it up."  R. 22-3 at 29–30.  Thomas died at the hospital about half an hour later.

Wilkerson filed this § 1983 action against Danzy, Stewart, the City of Akron, and its police department, alleging that Danzy violated Thomas's Fourth (and Fourteenth) Amendment rights by stopping, frisking, and shooting him, and that Danzy and Stewart together violated Thomas's Fourteenth Amendment rights by showing deliberate indifference to his serious medical needs after Danzy shot him.  Wilkerson also raised state assault-and-battery and wrongful-death claims against Danzy.  The district court concluded that Danzy should not receive qualified immunity for the stop and frisk or Ohio statutory immunity for assault and

battery.    At the same time, the court determined that Danzy deserved qualified and state immunity for the shooting, and that both officers deserved qualified immunity for the deliberate-indifference claim.

Danzy appealed the rulings against him, and Wilkerson appealed the rulings against her.

II.

Qualified immunity shields officers from liability so long as they do not violate clearly established rights that a reasonable officer in their shoes would have recognized.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  On appeal from the denial of summary judgment, we decide whether a "material fact dispute clouds [Danzy's] defense" or whether he is entitled to judgment as a matter of law.  *Northrup v. City of Toledo Police Dep't*, 785 F.3d 1129, 1131 (6th Cir. 2015); *see Plumhoff v. Rickard*, 134 S. Ct. 2012, 2017 (2014).  As the opponent of summary judgment, Wilkerson gets the benefit of all reasonable inferences from the record.

*Stop and frisk.*  The Fourth Amendment permits officers to stop and frisk individuals reasonably suspected of criminal activity.  *Terry v. Ohio*, 392 U.S. 1, 21, 27 (1968).  To justify a stop, an officer needs "specific and articulable facts" that, taken together, would cause a reasonable officer to suspect criminal activity.  *Id.* at 27.  A mere "hunch" isn't enough to satisfy the Fourth Amendment.  *Id.* (quotation omitted).  The officer must show that "a reasonably prudent man in the circumstances" would have "reason to believe that he [wa]s dealing with an armed and dangerous individual."  *Id.*

Danzy can't meet this standard, at least not sufficiently to keep the question from a jury. Danzy halted and frisked Thomas because he seemed "nervous," he "was looking around" as if for witnesses, he "bladed" his body in a way that Danzy interpreted as indicative of concealing a weapon, and he might have been casing houses to rob.  R. 22-2 at 38.  But what Danzy saw—Thomas's demeanor, glances, and his sideways motion—is captured on the dash-camera video, which we have reviewed.  At the very least, a jury could watch Thomas's behavior and disagree with Danzy that the objective officer would perceive furtiveness and reasonably suspect criminality or dangerousness.  Walking away from a consensual conversation with an officer is not in itself enough to justify reasonable suspicion.  Otherwise, why call it consensual?  It is for

the jury to decide if they believe that the objective officer would share Danzy's interpretation of what looks like "a permissible walk away from a police officer." *United States v. Beauchamp*, 659 F.3d 560, 570–71 (6th Cir. 2011).

"[I]t has long been clearly established that an officer needs evidence of criminality or dangerousness before he may detain and [frisk] a law-abiding citizen." *Northrup*, 785 F.3d at 1133. Lingering on the side of a road does not constitute such evidence—even late at night, in a high-crime area, without a nearby car, and "without evident purpose." *Family Serv. Ass'n ex rel. Coil v. Wells Twp.*, 783 F.3d 600, 604–05 (6th Cir. 2015). Neither does walking away from an officer—even after refusing to answer questions, *id.*, or for that matter hurriedly, in the middle of the night, in a high-crime housing project, *Beauchamp*, 659 F.3d at 570. All of that leaves a question for the jury about whether Danzy violated Thomas's clearly established rights.

Danzy insists that Vaughn's call to the police dispatcher sufficed to justify the stop based on the collective knowledge of the officers. True enough, we don't require a responding officer to cross-examine the summoning officer about the basis for information passed along over a police radio, and we impute the summoning officer's knowledge to his responding fellow. *United States v. Lyons*, 687 F.3d 754, 765–66 (6th Cir. 2012). But Vaughn's knowledge didn't suffice to establish reasonable suspicion either. Vaughn saw that the broken-down car was gone within a few minutes, while the men remained, and he knew of break-ins in the neighborhood. But it was still daylight, Vaughn saw genuine car trouble, he didn't know how long the car had been stranded before he'd seen it, and he didn't observe the men "engag[ing] in any type of behavior that is consistent with [burglary]." *Beauchamp*, 659 F.3d at 570.

It bears adding that Vaughn didn't ask the officers to stop and frisk the individuals—to engage in other words in nonconsensual questioning. He asked for a unit to check on two loiterers who may have had a good reason to be in the neighborhood—but may not have. For Danzy's part, he admits that he did not see Thomas or Gray doing anything suspicious. They approached the police car. Their explanation about the flat aligned with the facts Vaughn conveyed over the radio. Even if officers don't need to "rule out a suspect's innocent explanation for suspicious facts," they do need to show that a jury reasonably could come to just one conclusion: that the individuals acted suspiciously. *District of Columbia v. Wesby*, 138 S.

Ct. 577, 588 (2018). Not so here. Danzy is not entitled to summary judgment on the *Terry* stop and frisk.

*Use of force.* Wilkerson claims that the district court erred in the other direction—by granting Danzy qualified immunity for using deadly force against Thomas. An officer may employ deadly force to prevent a suspect's flight if, in the moments immediately preceding the officer's decision, he "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985); *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 407 (6th Cir. 2007). The inquiry is an objective one. We assume the vantage point of a reasonable officer confronted with the same facts, bearing in mind that the decisions occurred in a "split" second and making every effort to ignore the advantages of "the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). Also relevant are the severity of the crime, whether the suspect posed a threat to anyone, and whether he resisted the officers or fled from them. *Id.*; *see Livermore*, 476 F.3d at 404–05.

Danzy did not violate Thomas's clearly established Fourth Amendment rights. In the minute before Danzy fired, he and Stewart were wrestling a large and resistant suspect, one who managed to fight off two officers at once. No one disputes the scuffle. No one disputes that Thomas's gun discharged while the three men struggled on the ground. No one disputes that Thomas rapidly freed himself and started to run. And no one disputes the absence of evidence that he left the gun behind. In the moments preceding the decision to fire, a reasonable officer would have had probable cause to believe this suspect posed an immediate threat to both officers.

Wilkerson insists that Thomas never pointed the gun at Danzy and suggests that Thomas's gun discharged accidentally under his body during the tussle. That does not affect the outcome. Either way, a reasonable officer in this setting would believe himself in serious danger, knowing Thomas had a gun and knowing it had discharged.

Wilkerson adds that Thomas did not pose a threat to the officers when he ran away and, as the video suggests, grabbed at his falling trousers with both hands, making him unable to fire at the officers. But this fact and that inference do not change things. Once an officer reasonably

believes a suspect is dangerous to him, other officers, or other citizens, he may use deadly force and may do so even if the suspect attempts to flee. *Graham*, 490 U.S. at 396. That indeed is the fact pattern of one of our cases. *See Livermore*, 476 F.3d 397. Even if for a brief moment Thomas's falling pants occupied both of his hands, moreover, the moment remained brief. The interlude did not end the danger and did not give enough time to reassess the matter. *See Mullins v. Cyranek*, 805 F.3d 760, 766–67 (6th Cir. 2015). Nor was a warning feasible. In the span of two seconds, Thomas had cleared several yards. Danzy was racing after him, aiming as he ran. As far as Danzy knew, Thomas still had the once-discharged weapon (as the evidence shows he did), and nothing prevented Thomas from turning to fire upon the officers. That reality distinguishes this dispute from Wilkerson's case citations, which involve scenarios in which officers had reason to doubt the seriousness of the threat. Not one of them involved encounters in which the reasonable officer would believe that the suspect was armed or about to fire. The court correctly granted summary judgment to Danzy on the undue-force claim.

*Deliberate indifference.* Wilkerson separately argues that the court erred in granting summary judgment to Danzy and Stewart on the deliberate-indifference claim—namely that they violated Thomas's constitutional rights when they did not attend to his serious medical needs after Danzy shot him. When police injure a person while apprehending him, they generally satisfy the Fourteenth Amendment by summoning medical care and not intentionally or recklessly delaying his access to it. *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1097–98 (6th Cir. 1992).

Danzy called for medics immediately after securing Thomas, and Stewart called again minutes later to urge the ambulance to "step it up." R. 22-3 at 29–30. The medics experienced some delay in parking and struggled with Thomas's handcuffs, but there is no evidence that Danzy or Stewart had anything to do with the delay, let alone intentionally so. The court did not err in granting them summary judgment on this claim.

*Municipal liability.* Wilkerson contends that the Akron Police Department and the City maintained policies responsible for unconstitutional use of force and deliberate indifference to serious medical needs. But both claims fail on the merits, meaning that municipal liability does not exist either. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam).

*State-law claims.* Wilkerson filed assault-and-battery and wrongful-death claims against Danzy under Ohio law. Ohio law grants an officer immunity unless, in stopping, frisking, and shooting Thomas, he behaved recklessly, in "conscious disregard of or indifference to a known or obvious risk of harm to [Thomas] that [wa]s unreasonable under the circumstances." *Anderson v. Massillon*, 983 N.E.2d 266, 273 (Ohio 2012); *see* Ohio Rev. Code § 2744.03(A)(6). Because Danzy behaved reasonably under the circumstances, statutory immunity shields him from the wrongful-death claim for the same reasons qualified immunity shields him from the undue-force claim. *See Martin v. City of Broadview Heights*, 712 F.3d 951, 963 (6th Cir. 2013); *Chappell v. City of Cleveland*, 585 F.3d 901, 916 n.3 (6th Cir. 2009). As for the assault-and-battery claim, the defendants concede that it survives to the extent the stop-and-frisk claim survives.

For these reasons, we affirm and remand for further proceedings.