RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0019p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

CODY JONES,

*Plaintiff-Appellee*,

*v.*

CITY OF ELYRIA, OHIO, et al.,

*Defendants*,

ANTHONY J. WEBER, Badge #328, NICHOLAS CHALKEY, Badge #53, and PAIGE MITCHELL, Badge #229, individually and in their official capacities,

*Defendants-Appellants*.

No. 18-4157

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:18-cv-00929—James S. Gwin, District Judge.

Decided and Filed:  January 17, 2020

Before:  ROGERS, WHITE, and READLER, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:**  Frank H. Scialdone, David M. Smith, MAZANEC, RASKIN AND RYDER CO., L.P.A., Cleveland, Ohio, for Appellants.  Joseph F. Scott, SCOTT & WINTERS LAW FIRM, LLC, Cleveland, Ohio, for Appellee.

READLER, J., delivered the lead opinion in which ROGERS and WHITE, JJ., joined in part.  ROGERS, J. (pp. 21–22), delivered a separate opinion concurring in part and in the result.  WHITE, J. (pp. 23–26), delivered a separate opinion concurring in part and dissenting in part.

———————————

**OPINION**

———————————

CHAD A. READLER, Circuit Judge.  Three Elyria (Ohio) police officers were named as Defendants in this civil rights lawsuit brought by Plaintiff Cody Jones, following Jones's acquittal on charges arising from an altercation with those officers.  At summary judgment, the district court allowed the lion's share of claims against those officers to proceed to trial, denying the officers qualified immunity.  In doing so, the district court largely assessed the officers' conduct collectively, without distinguishing between their individual acts.

Our cases, however, require that each officer be assessed on her own terms.  And while we agree with the district court's treatment of the claims against Officers Nicholas Chalkley and Anthony Weber, Officer Paige Mitchell is uniquely situated.  As she arrived at the scene after Jones had already been detained and was being patted down, her actions, taken in view of the circumstances apparent to her at the time of her arrival, were not objectively unreasonable for purposes of overcoming qualified immunity.  Accordingly, we **AFFIRM IN PART** and **REVERSE IN PART** the judgment of the district court.

## I. BACKGROUND

A small set of facts is undisputed.  Officers Chalkley (often referred to as "Chalkey" in court documents) and Weber received a call that a potentially intoxicated white male was eating out of a dumpster located behind a shopping plaza.  But when the pair responded to the call, they did not see anyone by the dumpsters.  Scanning the plaza, the officers eventually spotted Jones, the only white male in the area, talking to two women in the plaza parking lot.  Although, as the officers acknowledge, they were not investigating a crime upon making first contact, Weber called out to Jones, asking him to approach the police cruiser.  What happened next is deeply disputed.

**A.  The Officers' Version Of Events.**

According to the officers, as Weber called out to Jones, the two women who had been speaking with Jones hurriedly walked away.  As they walked past Weber, they thanked him for his help.  At the same time, Jones ran behind a nearby clothing donation bin.  After repeated instructions from the officers to approach the cruiser, Jones reluctantly complied, emerging from behind the bin with his palms turned down and an unidentified object in each hand.  Weber instructed Jones to drop the objects.  Jones complied, dropping two green peppers.

Jones then resumed approaching the cruiser.  This time, his hands were in his pockets. Concerned that Jones might be concealing a weapon, Weber ordered Jones to keep his hands visible.  Jones obeyed only momentarily, quickly returning his hands to his pockets.  Once Jones reached the cruiser, Weber instructed Jones to place his hands on the hood.  Weber then gave Jones a pat-down, as Chalkley assisted.  When Jones again attempted to return one hand to his pocket, Chalkley grabbed Jones's hand.  Startled, Jones pushed off the hood of the car and attempted to punch Chalkley.

The officers took Jones to the ground.  Jones resisted.  He drew his arms underneath his body to avoid being handcuffed while kicking his feet at the officers.  He attempted to draw his knees under his body in an effort to stand up.  And he attempted to reach for Chalkley's holstered firearm.  In an effort to subdue Jones, Weber and Chalkley placed their weight on Jones's hip area and struck Jones in his arms and sides with closed fists.  Chalkley also punched Jones in the face after Jones grabbed Chalkley's testicles.

Officer Mitchell arrived at the scene during the pat-down.  As the scuffle with Jones ensued, Mitchell helped hold Jones's legs, to keep him on the ground. With Mitchell's assistance, Weber was able to tase Jones and end his resistance.

**B.  Jones's Version of Events.**

Jones tells a different story.  Making his way home after buying two green peppers from a nearby café, Jones stopped in the plaza to have a conversation with two women.  After talking to the women, Jones resumed walking, at which point he heard Weber call out.

Eventually realizing that Weber was speaking to him, Jones says he did as he was told. As he came toward the cruiser, Jones removed his hands from his pockets, kept them visible at all times, and then placed them on the hood of the cruiser. Weber and Chalkley performed a pat-down. Jones became nervous that he was being detained for no stated reason, so he looked over his left shoulder to speak with the two officers. In response, the officers took Jones to the ground.

Jones says he offered no resistance, and in fact struggled to breathe as his face was pressed against the concrete by an officer's forearm. Jones could not move his arms due to the weight of the officers on top of him. Despite his lack of resistance, Jones says he was repeatedly punched and tased by Weber and Chalkley, barely maintaining consciousness. Though Mitchell arrived later and assisted Weber and Chalkley with the arrest, Jones does not allege that Mitchell struck or tased him.

## C. The Aftermath.

Following the confrontation, Weber transported Jones to a nearby hospital, where Weber filled out a form to have Jones involuntarily committed. In that form, Weber stated that Jones was found searching for food in dumpsters, speaking nonsensically, and hallucinating. Weber's statements combined with Jones's history of mental health problems resulted in him being committed for psychiatric evaluation. That same day, Weber, Chalkley, and Mitchell each filled out patrol narratives describing the incident.

Shortly thereafter, the Lorain County prosecutor sought to indict Jones. To support an indictment, the prosecution called upon Lieutenant Juncker of the Elyria Police Department to testify before the grand jury. In his testimony, Juncker drew entirely from the patrol narratives prepared by the three officers.

Jones was indicted on charges of assault on a peace officer, obstructing official business, and resisting arrest. Before trial, the Lorrain County Court of Common Pleas held a suppression hearing to examine whether the officers had probable cause to arrest Jones. Jones, the officers, and Ruth Kennedy, a witness at the scene, all participated in the hearing. The officers and Jones offered testimony consistent with their respective versions of events described above. Kennedy

testified that she was one of the two women seen talking to Jones immediately before the incident. She denied that she hurriedly walked away from Jones, denied that she thanked Weber, and denied that she saw Jones resist officers. Despite that testimony, the Common Pleas Court concluded that officers had probable cause to arrest Jones.

Much of this same testimony was given at the ensuing jury trial. After five days of proceedings, the jury acquitted Jones on all charges.

Following his acquittal, Jones filed this § 1983 action. Jones asserted: (1) an excessive-force claim against Weber, Chalkley, and Mitchell, (2) a supervisory-liability claim against Chief Duane Whitely, (3) *Monell* and ratification claims against Whitely and the City of Elyria, and (4) wrongful-arrest and malicious-prosecution claims against all Defendants. He also brought state-law claims for assault, battery, wrongful arrest, and malicious prosecution against all Defendants along with a claim for intentional infliction of emotional distress against all Defendants except Whitely.

After discovery, Defendants moved for summary judgment. Defendants invoked qualified immunity to Jones's § 1983 claims and state-law immunity to Jones's remaining claims. In opposing the motion, Jones offered the affidavit of Dominique Camel, a second woman who claimed to have observed the altercation between Jones and the officers. Like Kennedy, Camel contradicted the officers' version of events, stating that she never observed Jones resist the officers.

The district court granted summary judgment to Whitely and the City of Elyria on all claims, and it granted summary judgment to all Defendants on the assault and battery claim, finding that it was barred by the statute of limitations. The district court, however, denied immunity to the individual officers on the federal excessive-force claim as well as the federal and state-law wrongful-arrest and malicious-prosecution claims.

## II. JURISDICTION

The district court had federal-question jurisdiction over the § 1983 claims. *See* 28 U.S.C. § 1331. And as the state-law claims arose from the same common nucleus of operative fact as

the federal claims, the district court had supplemental jurisdiction over those claims. *Watson v. Cartee*, 817 F.3d 299, 303 (6th Cir. 2016) (internal citations and quotation marks omitted).

That covers the district court's subject matter jurisdiction. But what about our appellate jurisdiction? Ordinarily, an order denying summary judgment is not a final order from which a party may appeal. *Hoover v. Radabaugh*, 307 F.3d 460, 465 (6th Cir. 2002) (internal citations omitted). In the § 1983 setting, however, the collateral order doctrine allows for an interlocutory appeal when a government actor is denied qualified immunity based on an issue of law. *Chesher v. Neyer*, 477 F.3d 784, 793 (6th Cir. 2007) (internal citation and quotation marks omitted). Accordingly, we have appellate jurisdiction to consider questions of federal law at stake in this appeal.

Because Jones's state-law claims were before the district court on the basis of supplemental jurisdiction,  we apply the substantive law of the forum state in evaluating them. *Rishoi v. Deutsche Bank Nat'l Tr. Co.*, 552 F. App'x 417, 421 (6th Cir. 2013) (quoting *Super Sulky, Inc. v. U.S. Trotting Ass'n*, 174 F.3d 733, 741 (6th Cir. 1999) ("A federal court exercising supplemental jurisdiction over state law claims is bound to apply the law of the forum state to the same extent as if it were exercising its diversity jurisdiction.")). Accordingly, our interlocutory appellate jurisdiction turns on a question of state law. That is, we have such jurisdiction only if the state whose law is at issue, here Ohio, has created "an underlying substantive right to the defendant official to be free from the burdens of litigation arising from acts taken in the course of his duties." *See Brent v. Wayne Cty. Dep't of Human Servs.*, 901 F.3d 656, 691 (6th Cir. 2018) (quoting *Marrical v. Detroit News, Inc.*, 805 F.2d 169, 172 (6th Cir. 1986)). As such, this question of Ohio law governs whether we may consider the state-law claims at this juncture. *See Brent*, 901 F.3d at 692 (internal citations omitted).

Turning to that question, Ohio law affords its officials complete immunity from suit, where the officer has not performed her official duties "with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code § 2744.03(A)(6)(b). And Ohio law makes an order on that question a final one, available for immediate appeal: "[a]n order that denies a political subdivision or an employee of a political subdivision the benefit of an alleged immunity from liability as provided in this chapter or any other provision of the law is a final order." Ohio

Rev. Code § 2744.02(C); *see also Hubbell v. City of Xenia*, 873 N.E.2d 878, 882 (Ohio 2007). Accordingly, we also have jurisdiction to consider the denial of state-law immunity to the officers.

## III. ANALYSIS

### A. Federal Claims.

#### 1. Standard Of Review For Qualified Immunity.

Qualified immunity shields government actors from civil liability for official acts that do not violate clearly established constitutional rights. *Walker v. Davis*, 649 F.3d 502, 503 (6th Cir. 2011). Whether government actors have violated a clearly established constitutional right is treated as a two-question inquiry: (1) did a violation of a constitutional right occur, and, if it did, (2) was that right clearly established at the time of the violation? *Baynes v. Cleland*, 799 F.3d 600, 609–10 (6th Cir. 2015). We review the legal aspects of the district court's decision to deny qualified immunity de novo. *Harrison v. Ash*, 539 F.3d 510, 516 (6th Cir. 2008) (citing *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1176 (6th Cir. 1996)). In so doing, we accept the facts assumed by the district court, which in turn considered the record in the light most favorable to Jones, the non-moving party. *Coffey v. Carroll*, 933 F.3d 577, 584 (6th Cir. 2019) (citing *Thompson v. Grida*, 656 F.3d 365, 367 (6th Cir. 2011)).

Important to today's case is the understanding that, in making this inquiry, we do not lump together each of the relevant government actors. Rather, we assess each actor's liability on an individual basis. *Dorsey v. Barber*, 517 F.3d 389, 399 n.4 (6th Cir. 2008) (citing *Ghandi v. Police Dep't of the City of Detroit*, 747 F.2d 338, 352 (6th Cir. 1984)). This principle follows from the Supreme Court's instruction that public officials be held accountable for their own actions, but not the actions of others. *Ghandi*, 747 F.2d at 352 (citing *Rizzo v. Goode*, 423 U.S. 362, 377 ( 1976)).

2. *Wrongful Arrest.*

a. Weber And Chalkley.

i. On the facts assumed by the district court, a jury could find that Weber and Chalkley violated Jones's constitutional rights by frisking him without reasonable suspicion.

To preserve public safety, we afford officers broad powers to investigate potential crimes. But those powers have limits. One fundamental limit is the prohibition on stopping and frisking a suspect without reasonable suspicion of criminal activity. *Terry v. Ohio*, 392 U.S. 1, 27 (1968). Reasonable suspicion, as the phrase is generally defined, means more than a mere hunch or intuition. At a minimum, it requires inferences from specific facts known to the officer that tend to suggest criminal activity. *Id.* at 21.

Weber and Chalkley admit they were not investigating a crime when they initiated contact with Jones. At worst, the officers heard reports that a man fitting Jones's rough description was eating out of a dumpster, a perhaps uncustomary but nonetheless non-criminal activity. Whether Jones then darted behind a donation bin after Weber called out to him is disputed by the parties. But even if that conduct occurred, scurrying away from a consensual conversation with a police officer is likewise not enough to create reasonable suspicion. *Wilkerson v. City of Akron*, 906 F.3d 477, 481 (6th Cir. 2018).

Compare this case to *Wilkerson*. There, an officer responded to a night-time call about two suspicious men in a neighborhood that had recently experienced a rash of burglaries. After arriving in the neighborhood, the officer saw two men who appeared nervous and who may have been casing houses. When one of the men turned his body away from the officer, possibly to conceal a weapon, the officer engaged the men and conducted a pat-down. On review, we concluded that the frisk was unlawful. One's presence in a public place at night in a high-crime area, by itself, was not enough to give rise to reasonable suspicion to justify frisking the individual, where the officer had not observed any conduct consistent with criminal activity. *Id.*

If the facts of *Wilkerson* did not establish reasonable suspicion, today's facts fall well short of the mark. Even on the officers' version of events, they were not responding to a call that suggested criminal activity. And when they arrived, they found Jones not by the dumpsters, as

had been reported, but talking to two women in the parking lot. Yes, Jones could have been concealing some criminal activity when, as the officers claim, he later hid behind the donation bin. But that level of speculation alone does not, for Fourth Amendment purposes, justify a pat-down. *United States v. Beauchamp*, 659 F.3d 560, 570–71 (6th Cir. 2011).

And this is all the more true given that, in our current posture, we accept the district court's view of the factual record in the light most favorable to Jones. *Coffey*, 933 F.3d at 584. Jones states that he did not attempt to avoid conversation or hide from the officers, as Weber alleges. Accepting that as true, Weber and Chalkley plainly did not have reasonable suspicion to give Jones a pat-down.

> ii. On the facts assumed by the district court, a jury could find that Weber and Chalkley violated Jones's constitutional rights by arresting him without probable cause.

The absence of reasonable suspicion to frisk Jones also undermines Weber and Chalkley's defense to the wrongful-arrest claim. It is well settled that officers must have probable cause before arresting a suspect. *Malley v. Briggs*, 475 U.S. 335, 340–41 (1986); *Wesley v. Campbell*, 779 F.3d 421, 428 (6th Cir. 2015). Generally speaking, probable cause is present when the circumstances known to an officer support the belief that a criminal offense has occurred or is ongoing. *Newman v. Township of Hamburg*, 773 F.3d 769, 772 (6th Cir. 2014). A finding of probable cause necessarily defeats a wrongful-arrest claim. *See id.* at 772–73.

Whether such probable cause existed, Defendants contend, was already decided by the state trial court's finding of probable cause at the suppression hearing. The upshot, they say, is that Jones is precluded from re-litigating that issue in federal court. True, as a general rule, parties are precluded from litigating an issue when they have already had a full and fair opportunity to do so in a prior case. *Amos v. PPG Indus., Inc.*, 699 F.3d 448, 451 (6th Cir. 2012) (internal citations omitted). But given the somewhat unique posture of this case—the finding of probable cause notwithstanding Jones's subsequent acquittal—we must determine whether this claim was fully litigated. Because the probable-cause issue was first litigated in an Ohio state court, the question of any preclusive effect of that court's judgment is one of Ohio law. *Bradley v. Reno*, 749 F.3d 553, 556–59 (6th Cir. 2014) (citing 28 U.S.C. § 1738).

As was the case for Jones, the Ohio state court's conclusion in *Reno* that officers had probable cause to arrest could not be appealed before the final judgment of acquittal was entered. 749 F.3d at 556 (citing *State v. Crawley*, 644 N.E.2d 724, 728 (Ohio App. 1994) (holding that the denial of a motion to suppress is not an appealable final order)). That acquittal, in turn, mooted any possibility to appeal the probable-cause determination, both here and there. *Reno*, 749 F.3d at 556. That fact is significant, as we have read Ohio law to say that unappealable state-court orders do not have preclusive effect on parties seeking to re-litigate an issue in a later case. *Id.* at 559. Thus, we will consider the probable-cause question anew here.

Jones was arrested for obstructing official business under Ohio Rev. Code § 2921.31. A violation of this statute requires an "affirmative act" by the suspect; refusing to comply with an officer's request is not enough. *See Patrizi v. Huff*, 690 F.3d 459, 464 (6th Cir. 2012) (citing *City of N. Ridgeville v. Reichbaum*, 677 N.E.2d 1245, 1248 (Ohio App. 1996)); *see also City of Hamilton v. Hamm*, 514 N.E.2d 942, 943–44 (Ohio App. 1986). But Jones's actions could scarcely be characterized as an affirmative act that obstructed police business. *See State v. McCrone*, 580 N.E.2d 468, 470–71 (Ohio App. 1989) (holding that a suspect's refusal to turn over his driver's license was not an affirmative act as required by statute). At most, Jones was refusing to submit to a pat-down. On Jones's version of events, he offered no resistance whatsoever—despite the fact that the pat-down was unlawful. Viewing the record in the light most favorable to Jones, Weber and Chalkley violated Jones's constitutional rights by arresting him without probable cause.

> iii.  These reasonable-suspicion and probable-cause safeguards are clearly established.

Not only are the rights identified above protected by the Constitution, but they are also quintessential examples of "clearly established" constitutional rights. The prohibition against conducting a non-consensual pat-down search in the absence of reasonable suspicion of criminal activity has been clearly established for more than five decades. *See Terry*, 392 U.S. at 27. Equally well settled is one's right to freedom from arrest without probable cause. *Malley*, 475 U.S. at 340–41. So too is the fact that, before one can be charged with violating Ohio's obstruction of official business statute, the suspect must commit an affirmative act of

obstruction.  *Smith v. City of Wyoming*, 821 F.3d 697, 716–17 (6th Cir. 2016).  As this collection of rights is clearly established, the two officers are not entitled to qualified immunity for the wrongful-arrest claim.

> b.  Mitchell.

Jones's wrongful-arrest claim against Mitchell, however, does not fare the same.  In the context of assessing a public official's claim to qualified immunity, we must consider each official on her own terms, examining the relevant events from her perspective in evaluating her entitlement to qualified immunity.  *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010) (internal citations omitted).  It follows that we will hold an officer responsible only for her "own individual conduct and not the conduct of others."  *Pollard v. City of Columbus*, 780 F.3d 395, 402 (6th Cir. 2015); *see Rizzo*, 423 U.S. at 377.  Viewed through that particularized lens, the allegations against Mitchell do not overcome her qualified immunity assertion.

Mitchell reached the scene well after Weber and Chalkley.  She was not there when her fellow officers made initial contact with Jones, nor did she witness the events leading up to the pat-down of Jones.  Indeed, that pat-down was already underway when Mitchell arrived.  And soon thereafter, she saw Weber and Chalkley take Jones to the ground.  Eventually, Mitchell assisted Weber and Chalkley in subduing Jones by holding his legs so that he could not kick her fellow officers.  At that point, other officers arrived to assist with Jones's arrest.

We have previously considered claims against a late-arriving officer unfamiliar with the full spectrum of earlier events.  *See Crawford v. Geiger*, 656 F. App'x 190 (6th Cir. 2016).  In *Crawford*, police received to a night-time 911 call that a break-in was ongoing at a furniture store.  Several officers responded, arriving at staggered times.  *Id.* at 200.  Unbeknownst to the officers, the true burglar had already left.  Also unbeknownst to the officers, the store owners who reported the crime had come to investigate for themselves.  *Id.* at 194.  In the dark, the officers and the owners mistook one another for the burglars.  *Id.*  In the resulting struggle, some officers ultimately used unnecessary (though fortunately not fatal) force before discovering the truth.  *Id.* at 195–97.  Those officers were later sued for claims of excessive force and wrongful arrest.  In assessing those claims, we considered each officer's assertion of qualified immunity

based on that officer's individual good-faith beliefs. *Id.* at 199. And in making that inquiry, we were guided by the circumstances apparent to each officer at the time of his arrival. *Id.* at 200–01. The officers who arrived earliest, and employed measures that they knew to be excessive, were denied qualified immunity; the officers who arrived in the heat of an ongoing altercation between their colleagues and the plaintiffs, on the other hand, were granted immunity. *Id.* at 201–04. *Cf. Binay*, 601 F.3d at 650–51 (employing an individual-focused reasoning but denying qualified immunity to all officials).

Assessing what a reasonable officer in her position would have known and done under the circumstances, Mitchell's actions appear quite unremarkable. Though, on Jones's version of events, he did not take violent action against Weber or Chalkley, Mitchell could not have known whether her fellow officers had another reason to take Jones to the ground—perhaps a firearm in Jones's pocket. Given the uncertainty, there is no doubt a similarly situated officer would have done precisely the same thing—assist her fellow officers in securing the suspect and ask questions later. And Mitchell's role, it bears reminding, was merely to hold Jones's legs while Weber and Chalkley allegedly engaged in excessive force in detaining Jones. Beyond restraining Jones for purposes of effectuating an arrest, Mitchell took no independent action against Jones that might constitute excessive force. *See id.* at 200–01. Though the actions of Weber and Chalkley, as described by Jones, and taken with a more fulsome appreciation of the facts on the ground, are enough to deny them qualified immunity, those actions are not imputed to Mitchell. *Id.* From what Mitchell is alleged to have known, effectuating Jones's arrest was the surest way to secure the scene. Mitchell may not be held liable for doing so.

*3. Excessive Force.*

a. Legal Standard.

The Fourth Amendment protects individuals from government actors employing excessive force in the course of an arrest or other seizure. *Graham v. Connor*, 490 U.S. 386, 395 (1989). Ascertaining whether force was excessive in any given case, however, is a fact-intensive inquiry, one that requires balancing the governmental interest at stake with the extent of the intrusion upon the individual. *Id.* at 396. To strike the balance, we look to "(1) the severity of

the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Estate of Hill by Hill v. Miracle*, 853 F.3d 306, 312–13 (6th Cir. 2017) (internal quotations and citation omitted). We assess these factors from the officer's perspective at the time when the excessive force allegedly occurred, rather than from the perspective of a reviewing court with the benefit of hindsight. *Id.* at 315.

b. Weber And Chalkley.

i. On the facts assumed by the district court, a jury could find that Weber and Chalkley violated Jones's Fourth Amendment rights by employing force despite the fact that Jones offered no resistance.

Viewing the evidence in the light most favorable to Jones, Weber and Chalkley employed excessive force in arresting Jones. By their own admission, the two officers tackled Jones to the ground, placed their weight on top of him, employed "closed fist strikes" on his arms and sides, punched him in the face, and then tased him. They likewise concede that, when they first arrived on the scene, they were not investigating a crime. In fact, they had little more than a vague, generalized suspicion that Jones might be a threat to himself or others. And as these events unfolded, Jones says he neither resisted nor made any attempt to escape, while repeatedly asking the officers to stop. On Jones's version of the facts, these actions were objectively unreasonable. *Aldini v. Johnson*, 609 F.3d 858, 867 (6th Cir. 2010) ("There is simply no governmental interest in continuing to beat [an arrestee] after he ha[s] been neutralized, nor could a reasonable officer [think] that there [is].") (internal citations omitted) (alterations in original).

Of course, whether Jones was actually offering resistance or attempting to escape is critical to this matter's ultimate resolution. That factual dispute appears to be one for a jury to resolve.

ii. The right not to be subject to excessive force during a government seizure is clearly established.

It is well established that an officer may not use more force than is necessary to effectuate the arrest of a suspect who offers no resistance. *See, e.g.*, *Bennett v. Krakowski*, 671 F.3d 553, 562–63 (6th Cir. 2011). Viewing the facts in the light most favorable to Jones, the force Weber and Chalkley employed against Jones appears to have been unnecessary, as the district court

concluded. Whether the events truly unfolded this way, however, is not for us to decide at this stage.

c.  Mitchell.

Here again, Mitchell is differently situated than her fellow officers. When Mitchell arrived on the scene, Weber and Chalkley were already struggling with Jones. She did not witness the events that led to the unlawful pat-down, nor do we impute to her the knowledge of facts known only to the other officers. Jones alleges only that Mitchell took hold of his feet while Weber and Chalkley restrained him. Mitchell did not tase Jones or strike him, even on Jones's own version of the events. Additionally, because Mitchell did not witness the events leading up to the altercation, she could have fairly believed that Jones posed a threat to Weber and Chalkley. A reasonable officer in that circumstance would likewise have helped secure the scene. And that is precisely what Mitchell did. As Jones does not say otherwise, Mitchell's actions did not violate Jones's Fourth Amendment rights.

*4.  Malicious Prosecution.*

The Fourth Amendment also protects private individuals against unjustified, or malicious, criminal prosecution. *Mills v. Barnard*, 869 F.3d 473, 479–80 (6th Cir. 2017). To make out a § 1983 claim for malicious prosecution, a plaintiff must establish: "(1) that a criminal prosecution was initiated against the plaintiff and that the defendant ma[d]e, influence[d], or participate[d] in the decision to prosecute; (2) that there was a lack of probable cause for the criminal prosecution; (3) that, as a consequence of a legal proceeding, the plaintiff suffered a deprivation of liberty . . . apart from the initial seizure; and (4) that the criminal proceeding must have been resolved in the plaintiff's favor." *Id.* (alterations in original) (internal quotation marks omitted) (quoting *Sykes v. Anderson*, 625 F.3d 294, 308–09 (6th Cir. 2010)).

Here, the third and fourth elements of the claim—deprivation of liberty and resolution in the plaintiff's favor—are not disputed by the parties. Accordingly, our inquiry turns on the first two elements: Whether the three officers made, influenced, or participated in the decision to prosecute Jones, and, separately, whether that prosecution was supported by probable cause. The latter question, as already explained, is not subject to issue preclusion as a result of the state

court's probable-cause finding.  We must assess whether the facts assumed by the district court show that each of the officers participated in the decision to prosecute Jones despite the lack of probable cause.

a.  Weber, Chalkley, And Mitchell Influenced The Decision To Prosecute Jones.

Liability for malicious prosecution is not limited solely to those who made the decision to prosecute the plaintiff.  Rather, liability also extends to those who significantly impacted that decision.  For instance, liability extends to an officer who included falsehoods in her investigatory materials, knowing that prosecutorial reliance is likely, where those materials actually influenced the prosecutor's ultimate decision to bring charges.  *Jackson v. City of Cleveland*, 925 F.3d 793, 820–21 (6th Cir. 2019) (citing *Sykes*, 625 F.3d at 316).

Even when viewed individually, the actions of Weber, Chalkley, and Mitchell all fit the malicious-prosecution bill.  Each of them filed a narrative report stating that Jones was actively resisting arrest by fighting with officers.  Weber claimed that Jones retrieved peppers from the dumpster, ran behind a donation bin, kicked and punched at officers, and then reached for Chalkley's firearm.  Chalkley claimed that Jones attempted to flee and grabbed Chalkley's testicles during a physical struggle.  Even considering Mitchell's limited personal knowledge of the events leading up to the encounter, if Jones's version of events is believed, she also made false statements.  She claimed that Jones was resisting arrest and fighting with officers even after Weber warned him that he would be tased—a warning Weber now admits he never gave.

Further, Ruth Kennedy testified that no struggle took place between Jones and the officers.  Kennedy's account is supported by affiant Dominique Camel.  Considering the record in the light most favorable to Jones, the claims of all three officers could be considered false—something each of them would have known.

Viewing the record in that same light, the officers' statements also influenced the ultimate decision to bring charges against Jones.  Indeed, it is hard to imagine a more clear-cut example of influence.  As the record reflects, Lieutenant Juncker appears simply to have read the officers' narrative reports to the grand jury to procure the indictment.  Thus, on facts a reasonable jury could find, Weber, Chalkley, and Mitchell each directly influenced the ultimate

decision to prosecute Jones by making false statements in their investigative materials.  *Jackson*, 925 F.3d at 820–21.

   b.   There Was No Probable Cause To Prosecute Jones.

Even where an officer makes false statements that influence the decision to prosecute a plaintiff, the plaintiff's malicious-prosecution claim still fails if the charges are supported by probable cause.  *See Bickerstaff v. Lucarelli*, 830 F.3d 388, 397 (6th Cir. 2016).  Ordinarily, an indictment issued by a grand jury would resolve the probable-cause inquiry.  But we have recognized an exception to that customary practice when the indictment was obtained in reliance on an officer's false statements in an investigative report.  *King v. Harwood*, 852 F.3d 568, 587–88 (6th Cir. 2017).  Here, again viewing the record in the light most favorable to Jones, and in light of Jones's allegation that his indictment was fueled by false statements, we will not treat the indictment as conclusive on the question of probable cause.

According to Jones, the three officers each made materially false statements related to the decision to bring charges.  Those charges included obstructing official business, assault on a peace officer, and resisting arrest.  On Jones's version of events, each charge lacked probable cause.

*Obstructing Official Business.*  As already discussed, it was clearly established at the time of Jones's prosecution that proving obstruction of official business requires proving an affirmative act on the part of the defendant.  *See Smith*, 821 F.3d at 716–17.  Refusing to comply with an officer's command, even a lawful one, is not enough.  *See, e.g.*, *Reichbaum*, 677 N.E.2d at 1248.  Here, the officers' lone basis to suspect Jones of obstructing official business was his refusal to submit to the pat-down.  Even on their own version of events, then, the officers did not have probable cause.

*Assault On A Peace Officer.*  To violate Ohio's general assault statute, Ohio Rev. Code § 2903.13, one must knowingly cause (or attempt to cause) physical harm to another or, alternatively, recklessly cause serious physical harm to another.  Ohio law defines physical harm as "any injury, illness, or other physiological impairment, regardless of its gravity or duration."

Ohio Rev. Code § 2901.01(A)(3). And the statute provides for an enhancement when the "victim of the offense is a peace officer." Ohio Rev. Code § 2903.13(C)(5)–(6).

Viewed in the light most favorable to Jones, the record reveals that he offered no resistance to the officers whatsoever, let alone resistance that caused them physical harm. At most, say even the officers, the only injury that resulted from the altercation was a wound to Chalkley's fist. And even if that wound constitutes physical harm under Ohio law, Jones did not cause the injury. Rather, Chalkley sustained the injury when *he punched Jones* in the face— hardly the makings of probable cause to prosecute Jones.

*Resisting Arrest.* Finally, Ohio Rev. Code § 2921.33 provides that "[n]o person, recklessly or by force, shall resist or interfere with a lawful arrest of the person or another." Defendants say probable cause existed to prosecute Jones because he resisted a lawful arrest. But Jones tells a different story, one in which he made no effort to resist an unlawful arrest. Viewing the record in the light most favorable to Jones, this charge too was unsupported by probable cause.

All told, for each of the three crimes for which Jones was indicted, a reasonable jury could find that Weber, Chalkley, and Mitchell each violated Jones's Fourth Amendment rights by making false statements that influenced the decision to prosecute him, despite a lack of probable cause.

c. The Right To Be Free Of Malicious Prosecution Is Clearly Established.

It is also well established that police officers may be held liable for malicious prosecution when they knowingly include false statements in their investigative materials, where those materials influence the ultimate decision to prosecute the plaintiff. *See, e.g.*, *Sykes*, 625 F.3d at 314; *Jackson*, 925 F.3d at 820–21. A reasonable officer would thus have known at the time of Jones's prosecution that such conduct could subject her to liability. As a result, Jones's malicious-prosecution claim also survives the officers' qualified immunity assertions.

**B.    State-Law Claims.**

Like its federal counterpart, Ohio law affords some measure of immunity to state public officials.  Employees of Ohio's political subdivisions enjoy immunity from liability for on-the-job duties where the employee does not act "with malicious purpose, in bad faith, or in a wanton or reckless manner."  Ohio Rev. Code § 2744.03(A)(6)(b).  Ohio courts have helped define the critical terms utilized in § 2744.03(A)(6)(b):

- "Malicious" means "harboring ill will or enmity" and as "intention or desire to harm another, usually seriously, through conduct which is unlawful or unjustified."  *Siegel v. Univ. of Cincinnati Coll. of Med.*, 28 N.E.3d 612, 627 (Ohio App. 2015) (citing *Bush v. Kelley's, Inc.*, 28 N.E.2d 745, 747–48 (Ohio 1969));

- "In bad faith" implies dishonesty, intentional wrongdoing, or an ulterior motive. *Cook v. Hubbard Exempted Vill. Bd. of Educ.*, 688 N.E.2d 1058, 1061–62 (Ohio App. 1996) (citing *Slater v. Motorists Mut. Ins. Co.*, 187 N.E.2d 45, 48 (Ohio 1962) (overruled on other grounds));

- "Wanton" denotes "the failure to exercise *any* care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result."  *Burgess v. Fischer*, 735 F.3d 462, 480 (6th Cir. 2013) (quoting *Anderson v. City of Massillon*, 983 N.E.2d 266, 273 (Ohio 2013) (original emphasis)); and

- "Reckless" means "conscious disregard of or indifference to a known or obvious risk of harm ... that is unreasonable under the circumstances and is substantially greater than negligent conduct."  *Burgess*, 735 F.3d at 480 (quoting *Anderson*, 983 N.E.2d at 273) (ellipsis in original).

Taken together, this standard requires far more than mere negligent or careless conduct.  It requires either intentional wrongdoing or a total disregard of a clear risk of harm.

*1.  Wrongful Arrest.*

Viewing the facts in the light most favorable to Jones, Weber and Chalkley are not entitled to state-law immunity.  If Jones was not suspected of a crime, there was no reason for the officers to attempt to pat him down and, accordingly, no reason for them to arrest him even if he refused to submit to the pat-down.  Because, according to Jones, Weber and Chalkley knew there was no probable cause to arrest Jones, and likewise knew that attempting an unlawful arrest would likely lead to harm to Jones or themselves, a jury could find that their conduct was wanton and reckless.  *See Wrinn v. Ohio State Hwy. Patrol*, No. 11AP-1006, 2013 WL 1200256, at *13

(Ohio App. 2013) (finding that an officer had acted wantonly by creating a substantial risk of injury through his forceful response to a concussed victim of a traffic accident). Ordinarily, Ohio law entrusts the evaluation of such conduct to juries. *See Campbell v. Massucci*, 944 N.E.2d 245, 255 (Ohio App. 2010) (internal citations omitted). That approach also makes sense here with respect to Jones's state-law wrongful-arrest claim against Weber and Chalkley. We thus agree with that aspect of the judgment below.

But the same is not true for Jones's claim that Mitchell's conduct rose to the level of wantonness or recklessness. While Weber and Chalkley's actions expose them to potential liability, Mitchell is responsible for only her own actions. Measuring those actions against those a reasonable officer in her position would have taken, Mitchell acted rationally in securing the scene and assisting in Jones's arrest. Accordingly, we reverse the judgment of the district court with respect to Jones's state-law wrongful-arrest claim against Mitchell.

### 2. *Malicious Prosecution.*

Lastly, we turn to Jones's state-law malicious-prosecution claim. Under Ohio law, a malicious-prosecution claim requires: "(1) malice in instituting or continuing the prosecution; (2) lack of probable cause; and (3) termination of the prosecution in favor of the accused." *Criss v. Springfield Twp.*, 564 N.E.2d 440, 443 (Ohio 1990) (internal citations omitted). As explained above, taking the facts in the light most favorable to Jones, the officers played a role in "instituting" the prosecution despite lacking probable cause. And as the resulting criminal proceeding was resolved in Jones's favor, all that remains is to ask whether the officers acted with malice.

For purposes of an Ohio malicious-prosecution claim, malice is defined as "the state of mind under which a person intentionally does a wrongful act without a reasonable lawful excuse and with the intent to inflict injury or under circumstances from which the law will infer an evil intent." *Butts v. Bjelovuk*, 717 N.E.2d 381, 384 (Ohio App. 1998) (citing *Criss*, 564 N.E.2d at 443). Here, viewing the facts in the light most favorable to Jones, a reasonable jury could infer malice on behalf of all three officers. As discussed above, the jury could find that all three officers lied in ways that were material to the eventual decision to prosecute Jones, for the

purpose of justifying their own prior actions. Though Jones's account of the facts may prove untrue, it is not our prerogative to resolve that question today.

## IV. CONCLUSION

For these reasons, we **AFFIRM IN PART** and **REVERSE IN PART** the judgment of the district court.

---

**CONCURRENCE**

---

ROGERS, Circuit Judge, concurring.  I concur in the result and join the lead opinion except for Part III.A.2.b, Part III.A.3.c, and the last paragraph of Part III.B.1.  Jones's responding brief on appeal does not answer the argument by appellant Mitchell that her qualified immunity motion should have been independently addressed by the district court.  Nor does Jones's brief answer Mitchell's argument that such a defendant-specific analysis would result in a grant of federal qualified immunity and state-law official immunity.  In this civil litigation, we may properly treat Jones's failure to respond regarding these issues as a concession of error with respect to appellant Mitchell.[1]  It is accordingly not necessary for us to address the substance of these issues.

The arguments raised by Mitchell in this regard are far from frivolous.  First, our law is clear that the district court erred by failing to analyze each defendant's liability separately.  *See Pollard v. City of Columbus*, 780 F.3d 395, 402 (6th Cir. 2015); *Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 570 (6th Cir. 2013); *Dorsey v. Barber*, 517 F.3d 389, 399 n.4 (6th Cir. 2008).

Second, it is at least arguable that Officer Mitchell in particular could have accepted the situation that she found when she arrived on the scene, and acted reasonably by attempting to stabilize the situation.  As the lead opinion explains, *Crawford v. Geiger*, 656 F. App'x 190 (6th Cir. 2016), provides support for this conclusion.  Jones, on the other hand, could have argued in response that our decision in *Laury v. Rodriguez,* 659 F. App'x 837, 846-47 (6th Cir. 2016)*,* leads to a different result.  But neither *Crawford* nor *Laury* is published, and neither case is cited by either party.  Jones simply makes no response to Mitchell's argument that, when her conduct is analyzed apart from that of Officers Weber and Chalkley, she is entitled to qualified immunity.

---

[1]While an appellate court is not required to rely on an appellee's failure to respond to an appellant's argument, *cf. Leary v. Daeschner*, 228 F.3d 729, 741 n.7 (6th Cir. 2000), it is well within our discretion to do so in this case.  The argument is squarely presented by appellant, and the plaintiff generally has the burden of rebutting qualified immunity.  *See United Pet Supply, Inc. v. City of Chattanooga*, 768 F.3d 464, 478 (6th Cir. 2014); *Smoak v. Hall*, 460 F.3d 768, 782 (6th Cir. 2006); *Hoard v. Sizemore*, 198 F.3d 205, 211 (6th Cir. 1999).

I would not purport to resolve the issue in this posture. It is sufficient to resolve Mitchell's qualified immunity on this appeal based on Jones's failure to respond to Mitchell's argument. *See Cincinnati Ins. Co. v. E. Atl. Ins. Co.*, 260 F.3d 742, 747 (7th Cir. 2001).

---

### CONCURRING IN PART AND DISSENTING IN PART

---

HELENE N. WHITE, Circuit Judge, concurring in part and dissenting in part. I agree with my colleagues' resolution of the immunity issues except regarding Jones's federal excessive-force and state and federal false-arrest claims against Officer Mitchell. I would affirm the district court's denial of immunity on those claims.

First, I do not agree with the separate concurrence that we should avoid deciding whether Officer Mitchell is entitled to qualified immunity on Jones's excessive force and wrongful arrest claims because Jones failed to respond to Mitchell's defendant-specific arguments on appeal. Our cases hold that "[t]his court cannot be forced to reverse the district court due merely to the [appellees'] failure to respond to the [appellant's] arguments." *Leary v. Daeschner*, 228 F.3d 729, 741 n.7 (6th Cir. 2000). Rather, we may affirm on any basis supported by the record. On this record, I would not find Jones's failure to respond to the specific argument on appeal to be a concession of error, especially because Jones made arguments specific to Officer Mitchell in the district court and because his failure to repeat those arguments before us is explained by his frustration with the Officers' attempts on appeal to re-interpret the facts in the light most favorable to the Officers. Jones's appellate briefing principally argues that we lack jurisdiction because the Officers fail to concede the facts in the light most favorable to Jones, which they must do before we have jurisdiction. *Thompson v. Grida*, 656 F.3d 365, 367 (6th Cir. 2011). We have dismissed for lack of jurisdiction based on similar arguments. *See, e.g.*, *id.* at 367-68 (finding officers' argument that they construed the facts in the light most favorable to the plaintiff belied by the record where the officers cited cases that were analogous only if one accepted the officers' version of the facts—i.e. that the plaintiff was acting aggressively). Therefore, I would proceed to decide whether—on Jones's version of the facts—Officer Mitchell is entitled to immunity on these claims.

Our cases recognize that an officer may be liable for a Fourth Amendment excessive force violation if a plaintiff proves that the officer: "(1) actively participated in the use of

excessive force, (2) supervised the officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010) (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)). Jones's Complaint alleges that "Officer Mitchell had the time and opportunity to intervene and stop Weber and Chalkley's uses of force but chose not to do so." R. 29, First Am. Compl. ¶ 31, at PID 270. To succeed on this theory, Jones must show that "(1) [Officer Mitchell] observed or had reason to know that excessive force would be or was being used, and (2) [Officer Mitchell] had both the opportunity and the means to prevent the harm from occurring." *Turner*, 119 F.3d at 429.

The lead opinion concludes that Officer Mitchell is entitled to qualified immunity on the excessive-force claim because Mitchell arrived on the scene after Weber and Chalkley and therefore "did not witness the events leading up to the altercation [and] could have fairly believed that Jones posed a threat to Weber and Chalkley." Lead Op. at 14. Taking the facts in the light most favorable to Jones, however, Officer Mitchell both observed the alleged use of excessive force and had sufficient opportunity to prevent it. Officer Mitchell's patrol narrative explains that she arrived on the scene right as Officer Weber began patting Jones down, which was immediately before Officers Weber and Chalkley took Jones to the ground and well before they administered closed-fist strikes or repeatedly deployed the taser. In fact, Officer Mitchell specifically recalls Officer Weber tasing Jones three times. *Id.* Therefore, by her own testimony, Officer Mitchell arrived in advance of and in time to prevent her colleagues' use of excessive force. Despite Jones's cooperation and lack of resistance,[1] Officer Mitchell did not intervene to stop her colleagues' use of excessive force—instead, she aided it by holding Jones's legs down. Viewing the evidence in the light most favorable to Jones, Officer Mitchell is not entitled to immunity on the excessive-force claim.

---

[1]The lead opinion remarks that "because Mitchell did not witness the events leading up to the altercation, she could have fairly believed that Jones posed a threat to Weber and Chalkley." Lead Op. at 14. That is true only if one believes the officers' version of the events, as Jones and the two eyewitnesses testified that Jones complied and did not resist, even after being taken to the ground.

For similar reasons, I would affirm the district court's denial of qualified immunity to Officer Mitchell on Jones's state and federal wrongful-arrest claims.**2** The law is clearly established that "[a]ny arrest, whether formal or *de facto*, requires probable cause." *Gardenhire v. Schubert*, 205 F.3d 303, 315 (6th Cir. 2000). Probable cause requires "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). The lead opinion concludes that Officer Mitchell is entitled to qualified immunity because "effectuating Jones's arrest was the surest way to secure the scene." Lead Op. at 12. As an initial matter, viewing the evidence in the light most favorable to Jones, this statement begs the question of what there was to secure. Jones and the eyewitnesses testified that Jones complied with the officers' commands and did not resist, and "Jones's actions could scarcely be characterized as an affirmative act that obstructed police business," Lead Op. at 10, meaning that there was no probable cause to arrest Jones for that crime, at least on Jones's version of the facts.

While we all agree that Officers Weber and Chalkley are not entitled to qualified immunity on these claims for this very reason, the lead opinion concludes that Officer Mitchell is entitled to qualified immunity on this claim because she arrived on the scene later than the others. In support of that conclusion, the opinion cites *Crawford v. Geiger*, 656 F. App'x 190, 201-04 (6th Cir. 2016), where we determined that late-arriving officers to the scene of a reported burglary were entitled to qualified immunity on various claims. However, *Crawford* confirms that the district court properly denied qualified immunity to Officer Mitchell. One of the late arriving officers in *Crawford*, Sergeant Hart, contended on appeal that he was entitled to qualified immunity on the wrongful-arrest claim. We determined that he was not entitled to qualified immunity because a reasonable jury accepting the plaintiff's version of the facts could have concluded that there was no probable cause to arrest plaintiff for burglary, breaking and entering, or any other crime. *Id.* at 206. The same is true here. The relevant inquiry is whether a reasonable officer in Officer Mitchell's position, observing what she observed, would have

---

**2**I note that Officer Mitchell did not argue in the district court that she was uniquely situated as compared to her colleagues with respect to Jones's state and federal wrongful-arrest claims.

helped secure Jones's arrest when, on Jones's version of the facts, she would have observed that Jones was never resisting any lawful command and had committed no crime. The answer is surely no. Therefore, I would affirm the denial of qualified immunity to Officer Mitchell on Jones's federal wrongful-arrest claim. I would similarly affirm the district court's denial of official immunity to Officer Mitchell on Jones's Ohio wrongful-arrest claim. On Jones's version of the events, Officer Mitchell would have had no basis to conclude there was probable cause to arrest Jones and, like the other officers, should have recognized that "attempting an unlawful arrest would likely lead to harm to Jones or themselves" such that "a jury could find that [Officer Mitchell's] conduct was wanton and reckless." Lead Op. at 18. I would affirm the district court's judgment in all respects.