**NOT RECOMMENDED FOR PUBLICATION**

File Name: 20a0386n.06

Case No. 19-2038

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jul 01, 2020
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| ANTHONY SEVY, | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| PHILIP BARACH, | ) | |
| Defendant-Appellant. | ) | |
| | ) | **O P I N I O N** |

BEFORE: MOORE, McKEAGUE, and READLER, Circuit Judges.

**McKEAGUE, Circuit Judge.** In February 2017, Anthony Sevy went to the state courthouse in Royal Oak, Michigan to pay a parking ticket. Sevy tried to pay the $10 ticket with his debit card, but he did not want to pay the $1.75 processing fee. So he left, went to the bank, and returned with $10 in rolled pennies. But the court didn't accept those coins, because under state law it did not have to accept any coins that weren't pure gold or silver. Sevy argued with the clerk and two court security officers—one of whom, Philip Barach, is the appellant here. Things escalated, and eventually Sevy was taken to the ground twice and arrested. The issue in this case is whether the court security officers went too far and thus violated Sevy's constitutional rights.

Sevy sued both officers under 42 U.S.C. § 1983, alleging violations of his First and Fourth Amendment rights. The district court denied Barach qualified immunity on those claims. Barach then filed this appeal. On the Fourth Amendment claims, Barach's appeal comes down to factual

disputes, which we lack jurisdiction to resolve at this interlocutory stage. On the First Amendment claim, Barach has demonstrated that Sevy's asserted First Amendment right was not clearly established at the time of the alleged violation, so Barach is entitled to qualified immunity on that claim. Therefore, we DISMISS the appeal of the district court's judgment on the Fourth Amendment claims for lack of jurisdiction, and we REVERSE the judgment of the district court on the First Amendment claim.

## I. Background

Anthony Sevy got a $10 parking ticket. In February 2017, he went to the state courthouse in Royal Oak, Michigan to pay it. He tried to pay with his debit card, but the clerk told him that would cost another $1.75, a processing fee. Sevy did not want to pay the extra fee, so he left.

He came back with $10 in rolled pennies. He went through security, where the court security officers (after the bag set off the X-ray machine) searched the bag and saw the pennies, but no weapons or other contraband. Apparently, Court Security Officer Philip Barach warned Sevy that the court wouldn't accept the coins. But Sevy went ahead anyway.

Sure enough, the clerk wouldn't accept the pennies. As it turns out, under a longstanding Michigan statute, the court was not required to accept coins that weren't pure gold or silver. Mich. Comp. Laws § 21.153. This rule was posted on a sign attached to the clerk's window.

After the clerk told Sevy that she wouldn't accept the coins, Court Security Officer Harold Marshall approached and joined the clerk behind the window. The parties disagree on how exactly the following exchange went, but all agree it was an argument. Marshall said he told Sevy to leave. He also claimed Sevy was standing his ground but not "physically squaring off." Sevy, for his part, said that once he realized the clerk wouldn't accept his coins, he asked for his ticket to be returned, but it took a little while to get it back.

Hearing the commotion, Barach made his way over to the window and joined Marshall, who was now also on the same side of the window as Sevy. According to Sevy, Barach was being aggressive with him and calling him a punk. According to Barach, Sevy was insulting both officers and the clerk. The argument continued for a few seconds, but eventually Sevy turned to leave the courthouse.

Here, the parties' stories diverge even more. Start with Sevy's version. According to him, he was leaving the courthouse and had made it through the vestibule when Barach grabbed him and turned him around. As Barach pushed him, Sevy initially tried to get his footing, until Barach threw him to the ground. While on the ground, Barach choked him by grabbing the back and side of Sevy's neck. At one point Sevy lost consciousness. When he came to, Royal Oak police officers arrived to help handcuff Sevy and escort him to the elevator.

Barach tells a different story. According to him, Sevy made it to the vestibule door, but then he froze. Barach put his arm on Sevy's back to nudge him so he'd keep walking. At that point, Sevy turned sharply around and knocked Barach's hand down. He took an aggressive stance and got in Barach's face. Barach decided to arrest Sevy, so he grabbed Sevy near his collarbone and tried to throw him to the ground—and eventually did, after a few moments of Sevy trying to pull away.

We can piece together some of what happened by looking at the courthouse surveillance videos. Sevy did open the first door in the vestibule. Barach did put his hand on Sevy's back. Sevy did turn around after Barach put his hand on him. And shortly after Sevy turned, Barach grabbed him, the two struggled for a few seconds, and then Barach took Sevy to the ground. But the events unfolded quickly, and the view was partially obstructed by the door frame and a bulletin board.

After Sevy was handcuffed, Barach and Marshall led him out of the vestibule and over to the elevator (where he would be processed upstairs). The parties again dispute what happened next, only this time there was no video inside the elevator to capture it. Sevy says one of the officers threw him to the ground, knocking Sevy's head against the side of the elevator in the process. Barach says he threw Sevy to the ground, but only after Sevy threw his head back and slammed Barach in the nose. Marshall says he saw Sevy thrown to the ground, but he didn't see what caused it because he was looking at Sevy's feet.

Sevy was interviewed, detained for a little while, and then sent home. Shortly after, he was charged with disorderly conduct, a charge to which he pled no contest. He then sued Barach and Marshall in the United States District Court for the Eastern District of Michigan. Sevy asserted several theories of recovery, including Fourth Amendment excessive force and First Amendment retaliation. Barach and Marshall moved for summary judgment, asserting the defense of qualified immunity.

The district court granted the motion in part and denied it in part. *Sevy v. Barach*, No.17-13789, 2019 WL 3556706, at *12 (E.D. Mich. Aug. 5, 2019). The court granted qualified immunity to Marshall, since he was not very involved in the use of force. *Id.* at *8. But the court denied qualified immunity to Barach on the First Amendment and both Fourth Amendment claims. *Id.* at *12. On the first Fourth Amendment excessive force claim, specifically the vestibule incident, the court denied qualified immunity because it found that the crime for which Sevy was arrested was not serious; that Sevy, unarmed and smaller than Barach, posed "little to no" threat to Barach; and that Sevy was "at most" only passively resisting. *Id.* at *6–8. For the elevator incident, because the court had to take Sevy's version of events as true, it had to assume that Barach threw Sevy to the ground unprovoked. *Id.* at *8. So the court found that Barach was not entitled to

qualified immunity for the elevator incident. *Id.* On the First Amendment retaliation claim, the court found that Barach's use of force could reasonably have been motivated by Sevy's protest of the coin and debit card processing policies, leading to the conclusion that Barach was not entitled to qualified immunity on that claim. *Id.* at *11. Barach timely filed this interlocutory appeal.

## II.  Standard of Review

We review the legal aspects of a district court's qualified-immunity analysis de novo. *Jones v. City of Elyria*, 947 F.3d 905, 913 (6th Cir. 2020). To determine whether a government actor is entitled to qualified immunity, we undertake a two-part inquiry: "(1) did a violation of a constitutional right occur, and, if it did, (2) was that right clearly established at the time of the violation?" *Id.* At the interlocutory stage, we view the facts in the light most favorable to the plaintiff—here, Sevy. *Coffey v. Carroll*, 933 F.3d 577, 584 (6th Cir. 2019).

## III.  Discussion

Barach appeals the district court's qualified-immunity denials on Sevy's Fourth Amendment excessive force and First Amendment retaliation claims. Sevy argues that this court does not have jurisdiction to hear the appeal and that, in any event, Barach is not entitled to qualified immunity. For the reasons set forth below, we hold that we lack jurisdiction over the excessive-force claims. We also hold that we do have jurisdiction over the First Amendment retaliation claim, and Barach is entitled to qualified immunity.

### 1.  *Jurisdiction*

We have jurisdiction to review a district court's denial of qualified immunity. 28 U.S.C. § 1291; *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). But our jurisdiction is limited. We can review "only purely legal questions." *McGrew v. Duncan*, 937 F.3d 664, 669 (6th Cir. 2019). Whether the district court record sets out a genuine issue of fact for trial is not one of these purely

legal questions. *Kindl v. City of Berkley*, 798 F.3d 391, 398 (6th Cir. 2015) (quoting *Johnson v. Jones*, 515 U.S 304, 319–20 (1995)). If a defendant wants the court to have jurisdiction over his interlocutory appeal, he must be "willing to concede the most favorable view of the facts to the plaintiff for purposes of the appeal." *Adams v. Blount County*, 946 F.3d 940, 948 (6th Cir. 2020) (quoting *Barry v. O'Grady*, 895 F.3d 440, 443 (6th Cir. 2018)).

*The* Scott v. Harris *Exception*. There is an exception to this jurisdictional rule, but it's a narrow one. The court can sometimes disregard a district court's factual finding, but only when it is so "blatantly contradicted by the record" that "no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007). The facts of *Scott* illustrate just how narrow this exception is. The case turned on how a motorist was driving during a car chase. *Id.* at 378-79. According to the motorist, he was driving safely—slowing for turns and intersections, using his turn signal, not running anybody off the road, and maintaining control of the vehicle. *Id.* at 379. The problem was that there was a video capturing the whole scene. *Id.* And the video told "quite a different story": it showed the motorist "racing down narrow, two-lane roads" at "shockingly fast" speeds, "swerv[ing] around more than a dozen other cars, cross[ing] the double-yellow line," and forcing cars off the road, among other things. *Id.* The video rendered the motorist's version of events "visible fiction," "so utterly discredited by the record that no reasonable jury could have believed him." *Id.* at 380–81. So the Supreme Court considered the facts "in the light depicted by the videotape." *Id.* at 381. We've since elaborated on how narrow the *Scott* holding is: "only 'where the trial court's determination that a fact is subject to reasonable dispute is blatantly and demonstrably false' based on irrefutable evidence such as clear video footage, 'a court of appeals may say so, even on interlocutory appeal.'" *Kindl*, 798 F.3d at 399 (quoting *Moldowan v. City of Warren*, 578 F.3d 351, 370 (6th Cir. 2009)).

Barach argues that his case falls under the *Scott* exception. As in *Scott*, here there were video cameras recording the scene. Barach claims these videos clearly contradict the district court's factual accounts of the vestibule incident, especially its finding that whether Sevy actively resisted arrest was subject to reasonable dispute. His argument is focused on three key alleged errors in the district court's factfinding.

First, Barach takes issue with the district court's conclusion that Sevy was not physically aggressive at the window. According to Barach, the videos clearly show Sevy "turn and step toward Ofc. Barach in obvious anger." Appellant Br. at 25. But the record does not clearly contradict the district court's account. According to Officer Marshall, Sevy was not squaring off or being physically aggressive—he was simply standing his ground. The videos show Sevy addressing Barach, but they do not show Sevy raising his hands or making any other motions that would render the district court's conclusion that he wasn't physically aggressive "visible fiction." *See Scott*, 550 U.S. at 380–81.

Second, Barach claims the district court failed to realize that Sevy was physically assaultive toward Barach when they entered the vestibule. Specifically, he claims that as Sevy was leaving, he stopped, froze, turned suddenly, knocked Barach's hand down, and took an aggressive stance. But the videos again do not clearly support this account enough to trigger the *Scott* exception. For one, the view of the vestibule is at least partially obstructed by the door in both videos. And while we see Sevy turn around after Barach placed his hand on Sevy's back, it is not clear whether the events unfolded exactly as Barach describes. This again is hardly the type of clearly contradicting video evidence that was available in *Scott*.

Third and finally, Barach claims the videos clearly show Sevy actively resisting arrest in the vestibule. He gives three reasons. First, Barach argues Sevy refused to follow an order to leave.

But Sevy denies this, and the videos do not have any audio, so they cannot clearly contradict Sevy's account. Second, Barach argues Sevy was physically resistive by knocking Barach's hand down and getting in Barach's face. But as we've already said, the videos do not clearly show this. Third, Barach argues that Sevy struggled against Barach before Barach ultimately took him down. But the video footage of this part is obstructed on both fronts—in one angle by Barach's back, in the other by the door and a bulletin board. Thus, there is not enough to say the videos clearly contradict the district court's conclusion that Sevy was merely struggling to get his bearings before the takedown.

*Vestibule Incident*. So Barach does not satisfy the *Scott* exception. And he never concedes Sevy's view of the facts for purposes of his appeal. *See Adams*, 946 F.3d at 948.[1] True, there have been cases where we've exercised jurisdiction even though the defendant never conceded the plaintiff's version of the facts. *See Beard v. Whitmore Lake Sch. Dist.*, 402 F.3d 598, 602 n.5 (6th Cir. 2005); *Phelps v. Coy*, 286 F.3d 295, 298 (6th Cir. 2002). But that was only when the factual disputes were "minor," *Beard*, 402 F.3d at 602 n.5, or resolving the factual disputes wasn't necessary to resolving the legal question—in other words, the factual issues were discrete from the legal ones, *Phelps*, 286 F.3d at 298. If, on the other hand, the factual disputes are "crucial to" the appeal, then we must dismiss for lack of jurisdiction. *Adams*, 946 F.3d at 951.

---

[1] Although Judge Readler would reach the merits of qualified immunity for the Fourth Amendment claim, we reiterate that under *Adams*, there are only "two narrow circumstances in which an interlocutory appeal record may contain some dispute of fact." *Adams*, 946 F.3d at 948. One is the *Scott* exception. *Id.* The other is when the defendant, "despite disputing a plaintiff's version of the story, is 'willing to concede the most favorable view of the facts to the plaintiff for purposes of the appeal.'" *Id.* (quoting *Barry v. O'Grady*, 895 F.3d 440, 443 (6th Cir. 2018)). "[O]therwise, we cannot entertain the defendant's arguments, no matter how meritorious they may be." *Phelps v. Coy*, 286 F.3d 295, 298 (6th Cir. 2002); *see also Barry*, 895 F.3d at 445. And Barach does not concede Sevy's version of the facts on the Fourth Amendment claim for purposes of his appeal. *See* Appellant Br. at 24–25 ("The District Court committed four significant legal errors in its conclusion that Ofc. Barach is not entitled to qualified immunity for this claim. Three errors were factual errors that are plainly contradicted by the record, and those errors underly the fourth error in application of the *Graham* standard.").

Here, the factual disputes are crucial to Barach's appeal. Consider, for instance, the issue of whether Sevy disobeyed orders to leave the courthouse. The parties dispute whether this occurred. And our excessive-force cases look to whether the plaintiff disobeyed the officer's orders. *See Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013) (noting that "noncompliance" can amount to active resistance if paired with "something more," such as "verbal hostility"). So to resolve the issue of whether a constitutional violation occurred, we'd need to resolve whether Sevy disobeyed orders to leave. Factual disputes like this are crucial to Barach's appeal on this Fourth Amendment claim. And for that reason, we lack jurisdiction to hear it. *Adams*, 946 F.3d at 951.

*Elevator Incident*. One last note. The district court also concluded that Barach was not entitled to qualified immunity for excessive force used during the elevator incident. *Sevy*, 2019 WL 3556706, at *8. On appeal, Barach focuses his briefing on the vestibule incident. But no matter, because we have no trouble concluding that the factual disputes are crucial to any appeal involving the elevator incident—the whole issue comes down to the disputed question of whether Sevy did anything to provoke Barach throwing him down. We lack jurisdiction to review that issue as well.

## 2. *First Amendment Retaliation*

That leaves the First Amendment retaliation claim. To prove a claim of First Amendment retaliation, plaintiffs must demonstrate "(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). If the plaintiff shows that the

protected conduct was at least a substantial or motivating factor behind the defendant's adverse action, then the burden shifts to the defendant to show he would have taken the same action even if the plaintiff had not engaged in protected conduct. *Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001).

We begin by noting that Sevy would have an uphill battle in showing causation. For one, it appears that he engaged in a mix of protected and unprotected activity. He argues he paid in pennies to protest the debit card processing fee. Symbolic protest is protected activity. *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995); *Texas v. Johnson*, 491 U.S. 397, 413 (1989). He could also criticize the court officers for enforcing the processing fee and the coin rule—that, too, would be protected activity. *See Barrett v. Harrington*, 130 F.3d 246, 264 (6th Cir. 1997). But disorderly conduct is not protected activity. *See Hagedorn v. Cattani*, 715 F. App'x 499, 506 (6th Cir. 2017). And Sevy pled no contest to disorderly conduct. A mix of protected speech and unprotected conduct makes the causation issue, to borrow a word from a previous case, "thorny." *Novak v. City of Parma*, 932 F.3d 421, 430–31 (6th Cir. 2019).

Add to that the legal framework. First Amendment retaliation claims often involve retaliatory arrests. But to establish a retaliatory arrest, plaintiffs generally must prove that the arresting officer lacked probable cause. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1721–23 (2019); *Hartman v. Thompson*, 931 F.3d 471, 484–85 (6th Cir. 2019). On appeal in this case, Sevy does not argue that Barach lacked probable cause to arrest him. That means his retaliation claim is not based on the arrest itself. Rather, Sevy's claim is based on the allegedly excessive force Barach used in carrying out the arrest. This certainly seems like a case where it would be "particularly difficult to determine whether the adverse government action was caused by the officer's malice or the plaintiff's potentially criminal conduct." *Nieves*, 139 S. Ct. at 1724.

Regardless, we need not untie this Gordian knot, because Sevy's asserted First Amendment right was not clearly established.[2] Recall that to overcome qualified immunity, Sevy must show that (1) Barach violated his constitutional rights, and (2) his right was clearly established at the time of the alleged violation. *Jones*, 947 F.3d at 913. A right is "clearly established" when the alleged conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In other words, the right is clearly established if someone in Barach's position should reasonably have known—based on existing law—that the conduct violated Sevy's First Amendment rights. *See Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018).

But it's not clear whether Sevy even had a viable First Amendment claim on his excessive-force retaliation theory, let alone whether his First Amendment rights were clearly established under existing law. For one, *Graham v. Connor* held that "*all claims* that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." 490 U.S. 386, 395 (1989). Read broadly, this could mean that *all* excessive-force claims must be evaluated under the Fourth Amendment. Indeed, "[m]ultiple lower federal courts . . . have extended *Graham* to preclude First Amendment claims based on alleged excessive force employed during an arrest." *Price v. Elder*, 175 F. Supp. 3d 676, 679 (N.D. Miss. 2016) (collecting cases).

---

[2] Barach makes the argument that Sevy's First Amendment right was not violated. But we need not even reach this issue because, under the same reasoning, we conclude that Sevy's right was not clearly established. *See McNeal v. Kott*, 590 F. App'x 566, 569 (6th Cir. 2014) ("One does not forfeit a qualified immunity defense by making arguments that, if accepted, establish the defense."). This issue requires us simply to look at existing law; we do not need to resolve any factual disputes. That makes this the type of "pure question of law" over which we have jurisdiction. "In determining the scope of our jurisdiction, we 'separate an appellant's reviewable challenges from its unreviewable.'" *Adams*, 946 F.3d at 948 (quoting *Diluzio v. Village of Yorkville*, 796 F.3d 604, 610 (6th Cir. 2015)). We thus have jurisdiction over this reviewable challenge, even though we lack jurisdiction over other parts of Barach's appeal.

Although the case law does not require a "case directly on point" for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela*, 138 S. Ct. at 1152 (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam)). Sevy has not pointed us to any Supreme Court or Sixth Circuit cases (nor are we aware of any) establishing his right to recover—on a First Amendment retaliation theory—for excessive force used in executing an arrest otherwise supported by probable cause. Nor has he established a "consensus of cases of persuasive authority." *See Wilson v. Layne*, 526 U.S. 603, 617 (1999). He cites only two unpublished district court decisions. Two of these cases do not a consensus make. *See id.* at 616–17. Therefore, Sevy's First Amendment right was not clearly established, so Barach is entitled to qualified immunity on that claim. *See Pearson v. Callahan*, 555 U.S. 223, 242 (2009) (holding that courts can "determine the order of decisionmaking" in the qualified-immunity analysis).

Judge Moore concludes otherwise, reasoning that Sevy's right to protest was clearly established, and a reasonable officer would have known not to use physical force in retaliation. But this is not a case about physical force in isolation. Rather, the issue is whether the use of excessive force in executing an arrest supported by probable cause can amount to a First Amendment, rather than a Fourth Amendment, violation. This is at least an open question, *see Graham*, 490 U.S. at 395, and existing precedents do not answer that question "beyond debate" in Sevy's favor, *see Kisela*, 138 S. Ct. at 1152. Thus, Sevy's First Amendment right to recover under this hybrid theory is not clearly established.

## IV.  Conclusion

For these reasons, we DISMISS the appeal for lack of jurisdiction over the Fourth Amendment excessive-force claims. We also hold that Barach is entitled to qualified immunity on the First Amendment claim, and so we REVERSE the district court's denial of summary judgment to Barach on that claim.

**KAREN NELSON MOORE, Circuit Judge, concurring in part and dissenting in part.**

I agree with the majority that we lack jurisdiction to consider Defendant-Appellant Philip Barach's challenges to the district court's denial of qualified immunity for Plaintiff-Appellee Anthony Sevy's Fourth Amendment excessive-force claims. I dissent from the majority regarding the district court's denial of qualified immunity for the First Amendment claim because the majority misapplies our caselaw addressing what constitutes a clearly established right for qualified immunity purposes.

Qualified immunity protects "government officials from liability for civil damages 'unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct.'" *Wood v. Moss*, 572 U.S. 744, 757 (2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). The critical focus is whether a reasonable officer would have "had fair notice that [his] conduct was unlawful . . . at the time of the conduct." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)). The "contours" of the right must be "sufficiently clear [so] that a reasonable official would understand that what he is doing violates that right." *Guertin v. Michigan*, 912 F.3d 907, 932 (6th Cir. 2019) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)), *cert. denied*, 140 S. Ct. 933 (2020). To demonstrate that a right is clearly established, a plaintiff does not need to identify a case that is "on all fours" or "directly on point," a case in which we have addressed the "prior, 'precise situation,'" or a case in which we concluded that "the very action in question has previously been held unlawful." *Id.* (citations omitted). In other words, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Importantly, we have reiterated the Supreme Court's observation that "[t]he easiest cases don't

even arise," meaning that plaintiffs are not penalized for failing to locate a closely analogous case when the official's conduct is beyond the pale. *Guertin*, 912 F.3d at 933 (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)); *see also Lanier*, 520 U.S. at 263, 271 (reversing the Sixth Circuit and concluding that a judge would have been on notice that sexually assaulting employees violated their constitutional rights).

Sevy's First Amendment rights to protest and criticize government officials is clearly established such that a reasonable officer would know that he could not use any force to retaliate against an individual for the exercise of that speech. Ample precedent shows that Sevy has a First Amendment right to protest, verbally and symbolically, the acts of government officials and to criticize those officials—this is not a close question. *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos., Inc.*, 515 U.S. 557, 569 (1995) (symbolic speech); *Cohen v. California*, 403 U.S. 15, 26 (1971) (protest in a courthouse corridor); *Greene v. Barber*, 310 F.3d 889, 895 (6th Cir. 2002) (utilizing crude language to criticize officers); *Barrett v. Harrington*, 130 F.3d 246, 264 (6th Cir. 1997) (criticizing public officials). Given the clarity of Sevy's First Amendment rights, a reasonable officer cannot claim that they would be surprised to learn that the use of physical force in retaliation for the exercise of those First Amendment rights was a constitutional violation. Moreover, the standard for whether an officer's action amounted to retaliation was decided twenty years ago in *Thaddeus-X v. Blatter*: whether the action "would 'deter a person of ordinary firmness' from the exercise of the right at stake." 175 F.3d 378, 396 (6th Cir. 1999) (en banc). Officers are more than capable of predicting whether their actions would meet that standard in the absence of a decision addressing identical action, particularly given the wide variety of conduct we have assessed under that standard. *See, e.g.*, *Arnett v. Myers*, 281 F.3d 552, 560 (6th Cir. 2002) (concluding that the removal of duck blinds amounted to retaliatory action in the First Amendment

context).    In short, it should not take a previous case holding that officers may not choke individuals in retaliation for their exercise of free speech, such as protest and public criticism of officers, to conclude that Sevy's rights were clearly established.    This case is a prime example of "the easiest cases don't even arise."  *Guertin*, 912 F.3d at 933 (quoting *Lanier*, 520 U.S. at 271).

For these reasons, I concur in the majority opinion's resolution of Barach's appeal of the district court's denial of qualified immunity for Sevy's Fourth Amendment claim, and I dissent from the resolution of Barach's appeal of the district court's denial of qualified immunity for the First Amendment retaliation claim.

**CHAD A. READLER, Circuit Judge, concurring in part and in the judgment.** Agreeing fully with the majority opinion's resolution of Anthony Sevy's First Amendment claim, I write separately to address Officer Philip Barach's challenge to Sevy's Fourth Amendment claim. Unlike the majority opinion, I would reach the merits of that challenge.

In characterizing our interlocutory jurisdiction over the denial of qualified immunity, we sometimes say our mandate is to review law, but not facts. *Leary v. Livingston County*, 528 F.3d 438, 441 (6th Cir. 2008). Consider an appeal challenging the legal determination that the plaintiff's facts demonstrate a violation of a clearly established constitutional right, meaning the defendant is not entitled to qualified immunity. *Jones v. City of Elyria*, 947 F.3d 905, 913 (6th Cir. 2020). These legal conclusions are the bread and butter of our interlocutory qualified immunity jurisdiction, and they are reviewable in the ordinary course.

Compare that circumstance to an appeal challenging only the record compiled at summary judgment, which must be viewed in the light most favorable to the non-moving party. *See* Fed R. Civ. Proc. 56(c). We ordinarily will not resolve these factual disputes so long as the plaintiff's version of events has some support in the record. *Scott v. Harris*, 550 U.S. 372, 380 (2007). In other words, we lack jurisdiction in this interlocutory posture over attacks aimed solely at the facts established by the plaintiff. *Johnson v. Jones*, 515 U.S. 304, 313 (1995) (explaining that a defendant may appeal the denial of qualified immunity only "to the extent that" the appeal "turns on an issue of law").

In reality, however, most arguments in this setting include features of both law and fact. Take, for instance, a case in which a district court draws factual inferences in denying on legal grounds at summary judgment a claim for qualified immunity. What part of that decision is eligible for interlocutory review? We have sometimes said that any factual inferences are insulated

from review, *Romo v. Largen*, 723 F.3d 670, 673–74 (6th Cir. 2015), yet we have acknowledged that this approach may be at odds with Supreme Court precedent. *See DiLuzio v. Village of Yorkville*, 796 F.3d 604, 609 (6th Cir. 2015) (acknowledging but declining to decide whether *Romo* is inconsistent with *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014)); *see also Romo*, 723 F.3d at 678 (Sutton, J., concurring) (construing Supreme Court precedent to permit interlocutory review of a district court's factual inferences). And we have routinely performed at least a perfunctory review of those factual inferences at summary judgment to ensure they are not "blatantly contradicted by the record" such that "no reasonable jury could believe [them]." *Scott*, 550 U.S. at 380. Otherwise, we risk working from a fictitious version of events in assessing a defendant's entitlement to qualified immunity. *See DiLuzio*, 796 F.3d at 609 (describing these often-implicit conclusions by the district court as "legal aspect[s] of the district court's factual determinations" at summary judgment).

Equally true, even in cases where there are genuine disputes over material facts, we do not dismiss the appeal on jurisdictional grounds merely because the defendant made some factual arguments or used aspects of her own factual account in mounting a legal argument for qualified immunity. *Id.* at 610 (citing *Wenk v. O'Reilly*, 783 F.3d 585, 599 (6th Cir. 2015)). Doing otherwise is a disservice to the Court and the parties. After all, more expansive jurisdiction maximizes qualified immunity protections for officials acting in good faith. It further guides and develops the law surrounding the constitutional questions before us. And it focuses future proceedings by identifying the controlling law and key disputes for trial. *Barry v. O'Grady*, 895 F.3d 440, 449 (6th Cir. 2018) (Sutton, J., dissenting).

2. All of this is to say that, at the very least, we must be careful on interlocutory appeal to separate reviewable arguments from non-reviewable ones. *DiLuzio*, 796 F.3d at 610. Yet to my

eye, the majority opinion has not followed this sound approach. Deeming all of Barach's Fourth Amendment arguments as turning on purely factual disputes, the majority opinion concludes that we do not have jurisdiction over any of Barach's challenges to the district court's denial of qualified immunity.

The majority opinion believes this result is required by *Adams v. Blount County*, 946 F.3d 940 (6th Cir. 2020). There, we seemed to suggest that a defendant must concede the plaintiff's version of events as a pre-requisite for our interlocutory jurisdiction. *Id.* at 948. But that suggestion would be a considerable extension of *Johnson*—one that cuts squarely against the common practice across the circuits, including this one. *Johnson*, of course, was the paradigmatic example of a fact-based appeal—the defendant went so far as to concede any legal argument in the event the appellate courts accepted the plaintiff's version of events. 515 U.S. at 307–09. Not so for Barach. He asserts, among other things, that the district court erred "in its application of the legal standard" to Sevy's version of events. That is, Barach contends that he employed reasonable force in arresting Sevy, as measured by *Graham v. Connor*, 490 U.S. 386 (1989), even on Sevy's version of events. That bread-and-butter legal argument is one we should entertain.

The majority opinion nonetheless denies jurisdiction over that claim because factual disputes are "crucial" to Barach's appeal. *Adams*, 946 F.3d at 951. Facts, of course, are crucial to every case. How crucial depends on context. Sometimes they are crucial because they are outcome-determinative. That was the case in *Johnson*. Where a defendant concedes that adopting the plaintiff's version of the facts demonstrates the violation of a clearly established constitutional right, the Court is left essentially with a factual dispute, making the facts crucial to the outcome. *See Johnson*, 515 U.S. at 313–14.

But in other cases, the facts are important, perhaps even crucial in a sense, yet leave for the Court a legal issue appropriate for interlocutory resolution. Consider that in nearly every qualified immunity appeal, the parties tell different stories. And each party's view of the facts often bleeds into her portrayal of the law. We in turn are left to resolve whether a clearly established constitutional violation occurred based upon the plaintiff's account of the facts, something the defendant rarely if ever concedes. If this run-of-the-mill scenario constitutes a "crucial" factual dispute that extinguishes our interlocutory jurisdiction, the *Johnson* exception would quickly become the general rule.

Rather than dismissing Barach's appeal for lack of jurisdiction, we should undertake the traditional qualified immunity analysis. Accepting *Adams*'s instruction to determine whether a factual dispute is "crucial," we should ask whether the plaintiff's version of events establishes the violation of a clearly established constitutional right, another way of asking whether accepting the plaintiff's version of events is outcome-determinative (or "crucial"). If the defendant maintains that adopting the plaintiff's view of events is not outcome-determinative, as Barach does here, a "pure question of law" remains for resolution. *Adams*, 946 F.3d at 948. I would therefore reach the merits of Barach's *Graham* argument.

3. Turning to that argument, to resolve whether a government actor is entitled to qualified immunity, we undertake a two-part inquiry: (1) did a violation of a constitutional right occur, and, if it did, (2) was that right clearly established at the time of the violation? *Jones*, 947 F.3d at 913. At issue here is the Fourth Amendment's prohibition against excessive force in making an arrest. Whether Barach disobeyed a clear constitutional command in arresting Sevy is resolved by considering the totality of the circumstances. Those circumstances include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others,

and whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. We view the facts objectively "from the perspective of a reasonable officer on the scene," employing a "measure of deference to the officer's on-the-spot judgment" about the force necessary under the circumstances. *Reich v. City of Elizabethtown*, 945 F.3d 968, 978 (6th Cir. 2019); *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002).

Accepting the district court's view of the facts, Sevy prevails on all three *Graham* factors. Start with the severity of the crime at issue, disorderly conduct. Under Michigan law, it is a minor offense. *York v. City of Detroit*, 475 N.W.2d 346, 349 (Mich. 1991). Now the threat that Sevy posed to Barach and Marshall. On the one hand, Sevy was younger than either officer. But on the other, he was smaller, alone, and unarmed (save for a bag of pennies). On balance, those factors arguably undermine a finding that Sevy posed a threat to the officers. *See Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167, 174 (6th Cir. 2004) (holding that the court "must consider the size and stature of the parties involved" in assessing the *Graham* threat factor). Finally, we consider whether Sevy offered any resistance. All agree a heated exchanged occurred between Sevy, Barach, and Marshall. All also agree Sevy swore loudly at the officers, drawing the attention of court patrons. But Sevy contests that he refused lawful orders to leave the courthouse. To Sevy's mind, he could not leave until the clerk returned his parking ticket. And while Sevy did spin around in the vestibule, he claims that maneuver came at the hands of Barach, who physically turned Sevy. Though I have doubts about Sevy's version of events, I do not see reversible error in the inferences drawn by the district court.

All told, assuming the truth of Sevy's record-supported account, Sevy was not actively resisting the officers. It follows that a reasonable jury could find that Barach violated Sevy's clearly established Fourth Amendment right not to be subjected to a takedown maneuver while

offering no resistance to an attempted arrest. *Smith v. City of Troy*, 874 F.3d 938, 945 (6th Cir. 2017). Sevy deserves the chance to make his case to a jury.

*　　*　　*　　*　　*

It is not our place to determine whether Sevy's account is correct. But it is our place, indeed our duty, to measure that account against the applicable legal standard. I would thus resolve Barach's appeal rather than dismiss it for purported jurisdictional defects.